FILED

JUL 2 6 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MITTAL STEEL USA ISG, INC.
4020 Kinross Lakes Parkway
Richfield, OH 44286

      Plaintiff

      V.

SAMUEL BODMAN
Secretary of Energy, United States
1000 Independence Ave. S.W.
Washington DC 20585

GEORGE B. BREZNAY
Director, Office of Hearings and Appeals
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington DC 20585

      Defendants

CASE NUMBER  1:05CV01466

JUDGE: Ellen Segal Huvelle

DECK TYPE: Administrative Agency Review

DATE STAMP: 07/26/2005

CLASS ACTION

---

## COMPLAINT

### A. NATURE OF ACTION, JURISDICTION AND VENUE

1. This is an action by a claimant to crude oil refunds from the U.S. Department of Energy who sought and was denied such refunds. It seeks reversal of such denial and the award of the appropriate amount of crude oil refunds.

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1331 and Sections 209-211 of the Economic Stabilization Act Amendments of 1971 ("ESA"), Pub. L. 92-210, 85

1

Stat. 743 (1971) as incorporated in the Emergency Petroleum and Allocation Act ("EPAA"),Pub. L. 93-259,87 Stat. 627(1973).

3. Venue is properly placed in this District pursuant to 28 U.S.C. 1391 (e).

B. <u>PARTIES</u>

4. Plaintiff Mittal Steel USA ISG Inc. ("ISG") is a Delaware corporation with its headquarters and principal place of business at 4020 Kinross Lakes Parkway Richfield, Ohio 44286. By virtue of its acquisition of the assets of the Weirton Steel Corporation in 2004, it acquired the claim to crude oil refunds of Weirton Steel Corporation, a claim which Weirton Steel Corporation had as a result of (i) its acquisition of the assets of National Steel Corporation at Weirton, West Virginia in January, 1984, and (ii) the creation after such acquisition, i.e. in 1986, of claimants' rights to crude oil refunds recovered by the U.S. Department of Energy ("DOE") pursuant to the ESA. In the administrative proceedings from the determination in which this appeal is taken, the name of the instant plaintiff was International Steel Group, Inc.; it was renamed Mittal Steel USA ISG Inc. when it was acquired by Mittal Steel Company NV.

5. Defendant Samuel Bodman is the Secretary of Energy of the United States, and in that capacity is charged with the administration of the ESA, EPAA, and the Petroleum Overcharge Distribution and Restitution Act of 1986, ("PODRA"), 15 U.S.C.

2

Sec. 4501 et seq.

6. Defendant George Breznay is the Director of the Office of Hearings and Appeals of the United States Department of Energy ("OHA" and "DOE"), the DOE's adjudicative agency which is in charge of the distribution of crude oil refunds.

C. THE BACKGROUND; THE CREATION OF CLAIMANTS' RIGHT TO CRUDE OIL REFUNDS

7. Pursuant to the authority of the ESA, the DOE (and its predecessor agencies) regulated the price of crude oil from August 1973 through January 1981, and, throughout that period as well as in the more than a decade following the end of regulation, recovered from producers and resellers of crude oil by litigation and through settlements for alleged overcharges by such producers and resellers. Pursuant to ESA Section 209, the DOE was required to use such funds for "restitution" to those who had been injured by the alleged overcharges.

8. Subsequent to deregulation in January 1981, when it was no longer possible to effectuate "restitution" by reducing the regulated price pursuant to which the refined products produced from such crude oil were sold, the DOE (in the provisions of settlements with some of the alleged overchargers), the Courts, and Congress (by legislative appropriation) provided for the use of some of the crude oil refunds which the DOE had recovered for various federal government purposes-- by distributing some of the

3

recovered crude oil funds to the States to fund a federal program
providing assistance for home heating to persons with low
incomes, by distributing some of the funds to the U. S. Treasury
for appropriation by the federal government, and directing the
use of some of the funds to purchase oil for the Strategic
Petroleum Oil Reserve. However, a substantial portion of the
recovered funds were held by DOE pending determination as to
their distribution.

9. The DOE resisted demands of others who asserted their
right to crude oil refunds: i.e. (i) the Refiners of the United
States who had purchased the crude oil from the producers and
resellers and asserted their right to 100% of the refunds
obtained by DOE on the basis of an argument that they had borne
the excess cost initially and had been unable to pass it through
downstream, i.e. to resellers, retailers and the end users of oil
products, (ii) resellers, retailers and end users asserted their
right to all, or a substantial portion of, the recovered funds on
the basis that each of them respectively had been injured by the
alleged overcharges, and (iii) the States of the United States
through their Attorneys General asserted their right to the
recovered funds as parens patriae on behalf of their citizens on
the basis that such would most effectively assure "restitution."

10. By a formal policy statement published July 2, 1985
(Statement of Restitutionary Policy, 7 Energy Mgmt. (CCH), 50

4

Fed. Reg. 27,400), the DOE confirmed its past determination to reject the claims of others and advised that it would retain the recovered funds for use by the federal government.

11. It was not until August 1986, in the settlement of litigation, In re The Department of Energy Stripper Well Exemption Litigation ("Stripper Well"), 653 F. Supp. 108 (D. Kan. 1986), that the DOE agreed to allocate a portion of the crude oil refunds to the Refiners, resellers, retailers, the States (for use in energy programs approved by the DOE), and end user claimants.

12. Thus, as it relates to the instant matter, it was not until the execution of the Stripper Well Settlement Agreement and the issuance, as required by that Settlement Agreement, of a Statement of Modified Restitutionary Policy, 51 Fed. Reg. 27,899 (1986), 7 Energy Mgmt. (CCH) par. 90,508 A, that manufacturers such as steel plant operators obtained the right to make a claim for crude oil refunds on the basis of refined petroleum products purchased for manufacturing use during the 1973-1981 regulatory period.

D. THE HISTORY OF THE OWNERSHIP OF THE CLAIM TO CRUDE OIL REFUNDS FOR PURCHASES AT THE WEIRTON, WEST VIRGINIA STEEL MANUFACTURING FACILITY

13. The right to claim crude oil refunds on the basis of refined oil products purchased at, and for, the Weirton steel

manufacturing facility came into existence with the execution of the <u>Stripper Well</u> Settlement Agreement and the issuance of the Statement of Modified Restitutionary Policy in the latter half of 1986. Indeed, it was not until April 1987 that a procedure for making such claims was established

14. More than two and a half years before the right to claim for purchases at Weirton was created, National Steel Corporation which had owned and operated the Weirton facility, and had done so during the 1973-1981 regulatory period, sold the operation to the Weirton Steel Corporation, an employee-owned corporation.

15. Under the terms of the Assignment and Assumption Agreement ("A & A Agreement")of April 29, 1983 memorializing the sale of the Weirton facility by National Steel Corporation to Weirton Steel Corporation, the claim to crude oil refunds which came into existence in 1986 was the property of the transferee, Weirton Steel Corporation. Under the terms of the A & A Agreement, "The Buyer (National Steel Corporation) will... retain any recovery from all Proceedings to the extent such Proceedings involve claims based on <u>facts </u>occurring on or after the Purchase Date (May 1, 1983)."(Section 7.4, emphasis supplied) (In the relevant Glossary, "Proceedings" are defined as including "any claim of the (Weirton) Division against any person... or request for relief which may be brought in any... administrative agency", and "person" is defined as including "a government or any agency

6

or political subdivision thereof.").

16. Three "facts" all must occur in order for there to be a "recovery" in "Proceedings" which "involve claims", i.e. recovery of crude oil refunds by a purchaser of refined petroleum products in proceedings before the DOE, i.e.:

(i) The claimant, or its predecessor, must have purchased the refined petroleum products on the basis of which the claim is made during the relevant period, i.e. August, 1973 through January, 1981 ;

(ii) DOE must have recovered the refunds which are sought in the "Proceedings";

(iii) The right to claim crude oil refunds must have been created.

This third "fact," i.e. the existence of a right to claim crude oil refunds, was not a "fact" as of either the Purchase Date (May 1, 1983) or the closing date (January 1984) of the National Steel-Weirton Steel transaction.

It became a "fact" only with the creation of the right to claim in the latter part of 1986.

Accordingly, the claim for crude oil refunds here was "based on facts occurring... after the Purchase Date," and the right to "recovery" from "Proceedings" involving such a claim passed to the Buyer, Weirton Steel Corporation.

(As to the second "fact" necessary for recovery of crude oil

refunds, i.e. that the funds to be claimed had been recovered by
DOE, such "fact" existed as of May 1, 1983 as to some of the
crude oil refunds, i.e. those already recovered, but not as to
others, i.e. funds which were not recovered until much later in
time when enforcement proceedings were concluded. Fortunately,
the allocation which might be required as between the seller,
National Steel Corporation, and the buyer, Weirton Steel
Corporation on the basis of the date of recovery by DOE need not
be addressed; the third necessary "fact", the existence of a
right to claim was not satisfied as to any of the crude oil
refund recoveries by DOE.)

17. The only possible alternative arguably applicable
provision of the A & A Agreement (Section 3.1) is in fact not
applicable. It provides an allocation as between National Steel
Corporation and Weirton Steel Corporation of any "rebate, refund
or reduction in rates from The Columbia Gas System, Inc
("Columbia Gas"), Consolidated Rail Corporation or any other
Person.". It provides that National Steel may "retain for its own
account any payments received from Columbia Gas, Conrail or any
other Person representing overcharges or refunds prior to the
Purchase Date." The provision applies to situations in which
there is a refund by, or recovery, from a vendor from which
National Steel purchased goods or services. Thus, it would apply
were there to be a refund by, or recovery from, a refiner or

8

reseller from whom refined oil products were purchased for the Weirton facility, including a recovery obtained in a suit against such refiner or reseller pursuant to ESA Section 210. It does not apply to recovery of crude oil refunds by the DOE pursuant to ESA Section 209, and the subsequent recovery by the purchasers of refined products from the DOE. Such recoveries are in "proceedings" provided for in Sections 7.1 to 7.4 of the A & A Agreement, and discussed above. Not only is the recovery from the DOE rather than from the vendor as required for Section 3.1 to apply, but even more importantly, the recovery is of refunds obtained from crude oil producers and resellers, with none of whom National Steel Corporation had any relationship, and therefore from none of whom National Steel could have recovered a "rebate, refund or reduction in rates."

E.   THE HISTORY OF THE APPLICATION FOR CRUDE OIL REFUNDS ON THE BASIS OF REFINED PRODUCTS PURCHASED AT THE WEIRTON STEEL PLANT

18. On June 2, 1989, "National Steel Corporation Weirton Steel Division" filed with OHA an application for crude oil refunds based upon purchase of 609,873,867 gallons of No. 6 residual fuel oil. It was docketed as RF 272-75497, and captioned by OHA as "National Steel Corp./Weirton. Shortly thereafter, in July, 1989, applications were filed for purchases at two other National Steel Corporation facilities, National Steel

9

Corporation-Midwest Steel Division, and National Steel
Corporation, Great Lakes Steel Division. Two years previously, in
July, 1987 an application was filed by National Steel Corporation
for its Granite City operations.

19. By Decision and Order issued March 1, 1991, OHA denied
all four applications filed by National Steel Corporation noted
in paragraph 18. It did so on the basis of a Waiver and Release
executed by the Permian Corporation ("Permian") September 12,
1986 in connection with a recovery by Permian of funds from the
Surface Transporters Escrow created pursuant to the Settlement
Agreement in In re The Department of Energy Stripper Well
Exemption Litigation, 653 F. Supp. 108 (D. Kan. 1986). OHA
interpreted the Waiver and Release as barring recovery of crude
oil refunds in the DOE crude oil refund proceedings by any
affiliate of Permian. It found that National Steel Corporation
was such an "affiliate" of Permian because (i) "National
Intergroup, Inc. (NII) has owned 50 percent of National since
1984, and (ii) "in 1985, NII acquired the Permian Corporation."

20. In denying the application of National Steel Corporation
for crude oil refunds based on purchases for the Weirton
facility, OHA was unaware that National Steel Corporation was not
itself a principal entitled to the crude oil refunds on the basis
of the Weirton facility purchases, but was merely acting as an
agent for the Weirton Steel Corporation which was entitled to

10

such refunds, for the reasons set forth in paragraphs 15-17 above. Presumably, National Steel Corporation was equally unaware that it was acting as an agent, believing it to be entitled to the refunds for Weirton purchases because it had operated the facility at the time the purchases were made; evidently, it was not sufficiently familiar with the history of the crude oil refund program to understand that the critical "fact" which was requisite for recovery of crude oil refunds-- the creation of a claimant's right to crude oil refunds-- did not occur until more than two years after its sale of the Weirton Steel assets to the Weirton Steel Corporation, and therefore, it was the Weirton Steel Corporation, not National Steel Corporation, which was entitled to the crude oil refunds on the basis of the Weirton purchases of refined petroleum product.

21. The Weirton Steel Corporation was not an affiliate of Permian when Permian executed the Waiver and Release, and accordingly, it was not barred as a crude oil refund claimant by virtue of the Permian release.

22. Weirton Steel Corporation was evidently equally unaware that it, not National Steel Corporation, was entitled to crude oil refunds based on purchases for the Weirton facility, presumably for the same reason, i.e. its unfamiliarity with the history of the creation of the right to crude oil refunds. Presumably for that reason, it did not itself assert a claim for

11

crude oil refunds, nor did it seek reconsideration of the denial
of refunds to National Steel for the Weirton operations.

23. By an Amended and Restated Asset Purchase Agreement,
dated February 25, 2004, Weirton Steel Corporation sold to
International Steel Group Inc. ("ISG") "All of the properties,
assets and rights of Sellers (Weirton Steel Corporation),
wherever located, whether real of personal, tangible or
intangible, existing or hereafter acquired and whether or not
reflected on the books or financial statements of Sellers,
excluding only the Excluded Assets, including without
limitation...

"(m) except as provided in Section 1.2 (c) and Section 1.2
(d) all Claims of Sellers."

The specific exclusions clearly do not include the right to
crude oil refund claims. Section 1.2 (c) excludes only claims for
refunds, overpayments or rebates of taxes and duties imposed on
imported steel. Section 1.2 (d) excludes only claims arising
under the Bankruptcy Code or similar state law, claims already
filed by Sellers in court, and claims "not relating to any
Acquired Asset or Assumed Liability," including claims arising
from or related to certain sections of the Bankruptcy Code. The
claim for crude oil refunds is one "relating to an(y) Acquired
Asset", i.e. the "equipment" and "machinery" which was being sold

12

and in which the fuel had been used on the basis of which the right to claim crude oil refunds exists.

24. Later in the same year of its acquisition of the crude oil refund rights of Weirton Steel Corporation, and upon having it called to ISG's attention that it had the right to assert Weirton Steel Corporation's crude oil refund rights, ISG moved for reconsideration by OHA of its prior denial of the application of National Steel Corporation/Weirton. It did so on the basis that, as a matter of law, National Steel Corporation had been acting as an agent, not as a principal in seeking refunds for its purchases at Weirton because it was Weirton Steel Corporation, not National Steel Corporation, which had the right to claim crude oil refunds for the Weirton operations, and therefore, OHA improperly denied the claim of National Steel Corporation/Weirton on the basis of Permian's execution of a waiver. The Motion for Reconsideration sought the award of crude oil refunds to ISG for the purchases of refined petroleum product at Weirton for which application had been made by National Steel Corporation.

25. By Decision and Order issued June 1, 2005, OHA denied the ISG Motion for Reconsideration, doing so on two bases: (i) the Motion for Reconsideration was "filed too late,", and (ii) pursuant to the Assignment and Assumption Agreement between National Steel Corporation and Weirton Steel Corporation, the

right to claim crude oil refunds belonged to National Steel
Corporation and not to Weirton Steel Corporation, and accordingly
was not conveyed to ISG by Weirton Steel Corporation.

26. More specifically,

(i) in finding the Motion for Reconsideration was not
timely filed, OHA acknowledges that it has considered motions for
reconsideration in the past, and relies for its finding of
untimeliness here on the fact that the Motion for Reconsideration
was here filed after the final filing deadline for crude oil
refund applications, i.e. June 30, 1995. OHA does not suggest
that the 1995 announcement of a deadline for filing claims in any
way advised that such would also be a deadline for filing motions
for reconsideration. Moreover, OHA has indeed considered and
granted motions for reconsideration filed not only after the
filing deadline for claims, but almost three years after the
applicant was in a position to seek reconsideration. See, e.g.
Hercules Incorporated, RR272-00204; here, the Motion for
Reconsideration was filed within a year of ISG's obtaining the
ownership of such claim and therefore the right to seek
reconsideration. Moreover, to the best of the appellants'
knowledge, OHA has never refused to make a merits determination
on a Motion for Reconsideration.

(ii) in holding that the A & A Agreement retained for

14

National Steel Corporation the right to claim crude oil refunds,
OHA (1) misses the point that the provision retaining for
National Steel Corporation any refunds or rebates is inapplicable
because the provision deals with situations in which a vender
remits a portion of the purchase price, while here the
acknowledged source of refunds is a third party, the DOE, and
refunds are of overcharges by parties with whom the refined
product purchaser has no relationship, i.e. producers and crude
oil resellers, and (2) in considering the allocation of funds
recovered in "Proceedings", OHA fails to recognize that one of
the essential "facts" giving rise to the right to recover crude
oil refunds, i.e. the creation of a claimant right to crude oil
refunds, did not occur until long after the sale of the Weirton
facility to Weirton Steel Corporation, thereby making Weirton
Steel Corporation the party entitled to the crude oil refunds
obtained in the Proceedings before OHA.

F. CAUSE OF ACTION

27. The averments of paragraphs 1 through 26 are
incorporated herein by reference.

28. National Steel Corporation, acting as an agent for
Weirton Steel Corporation applied for crude oil refunds on the
basis of refined petroleum products purchased for use at the
Weirton steel facility. National Steel Corporation was acting as

15

an agent only because, although it had operated the Weirton
facility during the period of crude oil price regulation, it had
sold the facility to Weirton Steel Corporation in January, 1984.
Pursuant to the Assignment and Assumption Agreement memorializing
such sale, it was the buyer, Weirton Steel Corporation, which was
entitled to recover crude oil refunds after that right was
created in 1986; such creation of the right to recover crude oil
refunds was a necessary "fact" on the basis of which crude oil
refunds could be claimed in Proceedings before the DOE, and
because that "fact" did not "occur" until after the Purchase
Date, May 1, 1983, it was Weirton Steel Corporation which had the
right to recover and retain any crude oil refunds in DOE
proceedings.

    29. Because National Steel Corporation represented itself to
OHA as the principal claiming crude oil refunds for purchases at
and for the Weirton facility and did not disclose it was merely
an agent for the principal entitled to such crude oil refunds,
Weirton Steel Corporation, OHA denied the application on the
basis that an affiliate of National Steel Corporation had waived
the right of National Steel Corporation as a principal to claim
crude oil refunds in the DOE proceedings. Had OHA been aware that
the principal entitled to crude oil refunds for the Weirton
purchases was Weirton Steel Corporation, it would not have denied

16

the refund claim on the basis of a waiver executed by an affiliate of National Steel Corporation; the waiver extended only to affiliates seeking refunds as principals, and Weirton Steel Corporation was not an affiliate of Permian Corporation which had executed the waiver.

30. Indeed, both National Steel Corporation and Weirton Steel Corporation failed to recognize that because the essential fact permitting the recovery of crude oil refunds-- the creation of the right of claimants to crude oil refunds-- did not occur until more than three years after the Purchase Date and two and a half years after the Closing date of the sale of the Weirton facility by National Steel Corporation to Weirton Steel Corporation, it was Weirton Steel Corporation, not National Steel Corporation, which was entitled to the crude oil refunds for the Weirton purchases for which National Steel Corporation had applied. Accordingly, neither National Steel Corporation nor Weirton Steel Corporation sought reconsideration or appealed the denial of crude oil refunds by OHA: National Steel Corporation accepted the OHA ruling that its interest as a principal had been waived by an affiliate, and Weirton Steel Corporation was not aware that it was entitled to the refunds and that it was not precluded by a waiver by an unaffiliated company.

31. ISG acquired the rights of Weirton Steel Corporation to

17

claim crude oil refunds for the purchases of refined oil products
for the Weirton facility on February 25, 2004, and immediately
upon being advised by its counsel that it was entitled to crude
oil refunds for the Weirton purchases, in December, 2005 sought
reconsideration of the denial of the claim for crude oil refunds
which had been filed by National Steel Corporation.

32. The Motion for Reconsideration filed by ISG was timely,
having been filed immediately after ISG became aware of its right
to do so, some ten months after it acquired the right to file
such a motion, and within the period provided by OHA for the
verification of the right of crude oil refund claimants as to
their right to receive a distribution of additional funds.

33. To the extent to which OHA's denial of the Motion for
Reconsideration filed by ISG was based on a finding that it was
"filed too late," OHA abused its discretion, acting
inconsistently with its prior practice of considering motions for
reconsideration on the merits whenever filed. Moreover, to the
extent to which the finding that the motion was "filed too late"
relied on the fact that it was filed after the deadline date for
making new crude oil refund claims, June 30, 1995, such a finding
was warranted neither by the notice establishing a final deadline
for filing new claims which notice did not in any way suggest
that the new claims deadline would apply to motions for

18

reconsideration of the denial of timely filed claims, nor has it indeed been OHA's practice and policy to refuse to consider motions for reconsideration filed after the deadline date for filing new claims.

34. OHA erred as a matter of law in interpreting the provision in the A & A Agreement between National Steel Corporation and Weirton Steel Corporation dealing with "any rebate, refund, or reduction in rates" as being applicable to recovery of crude oil refunds in proceedings before OHA, inter alia, because the provision deals only with amounts received directly from the vendors to whom National Steel Corporation made payments, not to recoveries from a third party, here the DOE, and because the provision deals only with the recovery of amounts recovered from the vendor with whom National Steel Corporation dealt, not with amounts received by the DOE from crude oil producers and resellers with whom National Steel Corporation had no relationship.

35. OHA erred as a matter of law in interpreting the provision in the A & A Agreement between National Steel Corporation and Weirton Steel Corporation dealing with recovery in Proceedings, incorrectly holding that the "facts" which made recovery possible occurred prior to the Purchase Date. Although OHA correctly found that one of the "facts" necessary for

19

recovery-- the purchase of refined petroleum products during the period of regulation of crude oil prices-- did occur prior to the Purchase Date, it failed to recognize that the critical "fact" making possible recovery of crude oil refunds-- the creation of the right of claimants to crude oil refunds and the creation of a crude oil refund program in which such recovery could be made-- did not occur until after the Purchase Date. OHA also failed to recognize that to a significant extent the third "fact" necessary for recovery of crude oil refunds-- that the funds be recovered by DOE from crude oil producers and resellers-- did not occur until after the Purchase Date.

36. As a matter of law, the "Proceedings" provisions of the A & A Agreement are the applicable provisions for determining the right to crude oil refunds for the Weirton purchases, and because one of the three essential "facts" making recovery possible-- the creation of a claimant right to crude oil refunds and of a crude oil refund program-- did not occur until after the Purchase Date, and another of the three essential "facts" making recovery possible-- that the funds sought from DOE had been recovered from crude oil producers and resellers-- had only partially occurred by the Purchase Date, it was Weirton Steel Corporation which was entitled to crude oil refunds for purchases at the Weirton facility during the crude oil regulatory period.

20

37. ISG acquired the right of Weirton Steel Corporation to crude oil refunds for the purchases at the Weirton facility by the Amended and Restated Asset Purchase Agreement, dated February 24, 2004 between itself and Weirton Steel Corporation, and is accordingly entitled to the crude oil refunds for which National Steel Corporation timely applied as an agent for Weirton Steel Corporation.

WHEREFORE, plaintiff prays for Orders of this Court as follows:

(a) reversing the denial by defendant Breznay for defendant Bodman of the Motion for Reconsideration filed by plaintiff seeking crude oil refunds for the purchase of refined petroleum products by National Steel Corporation at the Weirton, W. Va. Steel manufacturing facility;

(b) directing defendants in their official capacities with OHA and DOE to award to ISG crude oil refunds for such purchases to the same extent as all other claimants who have already received crude oil refunds and to whom additional crude oil refunds will be distributed;

(c) an order awarding plaintiff its costs, including a reasonable attorney's fee;

(d) an order granting such other and further relief as may

be just and proper.


Respectfully submitted,


Philip P. Kalodner
208 Righters Mill Road
Gladwyne PA 19035
DC Bar 973578

Attorney for Plaintiff

July 26, 2005


22