# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **MITTAL STEEL USA ISG, INC.,** | ) |
|  | ) |
| **Plaintiff,** | ) |
| **v.** | ) **CIVIL ACTION NO. 1:05CV01466ESH** |
|  | ) |
| **SAMUEL BODMAN, Secretary of** | ) |
| **Energy,** *et al.,* | ) |
| **Defendants.** | ) |

_____)

## <u>FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

The Federal Defendants, Samuel Bodman, Secretary of Energy, and George B. Breznay,

Director, Office of Hearings and Appeals, United States Department of Energy, hereby move the

Court, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, for summary judgment.

The Federal Defendants'  motion is based on the arguments and citations to authority set forth in

their accompanying memorandum in support of this motion.

Respectfully submitted,


_____

PAUL T. MICHAEL
STEPHEN C. SKUBEL
United States Department of Energy
Office of the General Counsel
Room 6H-087 (GC-32)
1000 Independence Ave., S.W.
Washington, D.C. 20585
Telephone: (202) 586-1303

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                          )

**MITTAL STEEL USA ISG, INC.,**     )
                          )

          **Plaintiff,**     )
                          )

      **v.**                  )   **CIVIL ACTION NO. 1:05CV01466ESH**
                          )

**SAMUEL BODMAN, Secretary of**     )
**Energy,** *et al.,*                  )
                          )

          **Defendants.**     )
_____)

## FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION AND SUMMARY

Plaintiff Mittal Steel USA ISG, Inc. ("Mittal") asks this Court to reverse a June 1, 2005 agency decision that denied Mittal's request for a refund from an escrow containing crude oil overcharges that is administered by the Department of Energy's ("DOE") Office of Hearings and Appeals.  Certified Agency Record ("R") 392-95.  Defendants Samuel Bodman, Secretary of Energy, and George B. Breznay, Director, Office of Hearings and Appeals ("OHA") (hereinafter the "Federal Defendants"), oppose that request and move for summary judgment on the ground that there is no genuine issue as to any material fact relevant to their motion and that they are entitled to summary judgment as a matter of law.

The essence of Mittal's claim is that its right to such refund flows from an asset purchase it made in February 2005 from Weirton Steel Corporation ("Weirton Steel"), see the Plaintiff's Complaint ("Comp.") at ¶ 23, which in turn had flowed from the April 1983 Assignment and

Assumption Agreement between Weirton Steel (an employee owned entity) and National Steel Corporation ("National Steel"), Comp. ¶ 15.  Under the terms of the April 1983 agreement, National Steel sold the assets of its Weirton, West Virginia steel plant facility to Weirton Steel. Comp. ¶¶ 4, 14.  Plaintiff alleges that its right to a refund from the escrow fund administered by OHA was not actually owned by National Steel, a fact that Plaintiff claims National Steel did not know even though National Steel attempted to obtain a refund in June 1989 by unsuccessfully filing a claim on its own behalf with OHA.  Comp. ¶¶ 18-20.  National Steel's claim was denied by OHA on March 1, 1991.  *Id.*; R. 271-74.  Plaintiff also alleges that National Steel, in filing that claim, was unknowingly acting as an agent for Weirton Steel, which owned the right to a refund, according to the Plaintiff; and that even Weirton Steel did not know it had this right. Comp. ¶¶ 20, 22.  Furthermore, Plaintiff alleges that even it did not know that it had this right after entering into an asset purchase agreement with Weirton Steel in February 2004, and that it was only after this information was brought to its attention did the Plaintiff seek to enforce its right before OHA.  Comp. ¶¶ 23-24.

The Plaintiff's claim in this Court can not withstand scrutiny, since it is supported by nothing more than smoke and mirrors, and it should be dismissed out of hand.  The Federal Defendants will show that OHA's decision is correct on the merits and that the Plaintiff's complaint should be dismissed with prejudice.[1]

---

[1] The Plaintiff's claim was dismissed by the agency on two independent grounds: (1) that it is untimely; and (2) that it is without merit.  R. 392-95.  The Federal Defendants do not assert here the issue of whether the Plaintiff's claim was timely but, instead, seek to dismiss the complaint only on the ground that it is without merit.

## II. <u>STATEMENT</u>

### A.  Regulatory Background

In response to the oil embargo imposed by the Organization of Petroleum Exporting Countries in the 1970s, Congress enacted the Emergency Petroleum Act of 1973 (EPAA), 15 U.S.C. § 751 *et seq. (1982)* .  Under the EPAA, which incorporated by reference portions of the Economic Stabilization Act of 1970 (ESA), 12 U.S.C. §1904, note (1976), the Department of Energy (DOE) and its predecessor, the Federal Energy Administration, issued price control orders governing the sale and resale of crude oil, in amounts and at prices specified in the regulations.

The oil price control regime remained in place until January, 1981, when the President ended it by executive order.  Executive Order No. 12287, 46 Fed. Reg.9909 (1981).  The EPAA expired by its own terms on September 30, 1981.  15 U.S.C. § 760g (1982).  A savings provision, however, preserved enforcement proceedings based on acts committed or liability incurred prior to the expiration date.  15 U.S.C. § 754(a)(2) (1982).   DOE's authority to collect overcharges was subsequently repealed, barring actions commenced after September 30, 1988, or six years after the alleged price control violation, whichever was later. 15 U.S.C. § 4504(a) (1988).

The EPAA incorporated Sections 207, 208, 209, and 211 of the administrative and enforcement provisions of the ESA. 15 U.S.C. § 754(a)(1) (1982).  Under Section 207, "functions exercised under this title are excluded from the operation of subchapter II of chapter 5, and chapter 7 of title 5, United States Code." 12 U.S.C. § 1904 note (1976).  Congress thus withdrew the general cause of action conferred by the Administrative Procedure Act, 5 U.S.C. §

551 *et seq.*, 701 *et seq.*, from claimants under the EPAA. As for enforcement, Section 209

authorized the government to obtain "restitution of moneys in violation" of the DOE price

controls. 12 U.S.C. § 1904, note (1976). A companion provision, Section 210, provided a

separate private cause of action for persons to recover money damages (including treble

damages) for violations of the price control regulations. *Ibid.* Section 211 of the ESA provided,

in relevant part, that "district courts of the United States shall have exclusive original jurisdiction

of cases or controversies arising under this title, or under regulations or orders issued

thereunder," and created the Temporary Emergency Court of Appeals ("TECA") and vested it

with exclusive appellate jurisdiction in such cases. *Ibid.*[2]

During the period of price and allocation controls, the Federal Energy Administration and

the DOE undertook to recover overcharges by various refiners and others pursuant to the

enforcement authority of the Economic Stabilization Act, 12 U.S.C. §1904 note (1976 ed.),

which was incorporated into the EPAA, as amended. Through administrative enforcement

actions, court judgments and settlements, the agency recovered overcharge amounts from the

petroleum industry and, pursuant to various settlements, legislative mandates, and implementing

regulations, the DOE provided for the restitution of these monies to affected consumers.

The DOE originally employed a wide variety of remedies pursuant to its enforcement

---

[2] The Temporary Emergency Court of Appeals ("TECA") was established by Section 211(b)(2) of the ESA, as incorporated into Section 5(a)(1) of the EPAA, as the court of appeals with exclusive jurisdiction to entertain appeals from the district courts in cases and controversies arising under the ESA or under regulations or orders issued thereunder. However, the court was dissolved on April 29, 1993, and its jurisdiction transferred to the United States Court of Appeals for the Federal Circuit. Federal Courts Administration Act of 1992, Pub L. No. 102-572, 106 Stat. 4506 (1992). In turn, the Federal Circuit has adopted the precedent of the Temporary Emergency Court of Appeals as its own. *Texas American Oil Corp. v. Department of Energy*, 44 F.3d 1557 (Fed. Cir. 1995) and *Phoenix Petroleum Co. v. Federal Energy Regulatory Commission*, 95 F.3d 1555 (Fed. Cir. 1996).

powers, such as compelling restitution by means of refunds to first purchasers, ***Midwest Petroleum Co. v. Department of Energy***, 760 F.2d 287 (Temp. Emer. Ct. App. 1985); restitution by means of payments to identifiable end-users, ***Tenneco Oil Co.,*** 46 Fed. Reg. 29499 (June 2, 1981); restitution by means of payments to the United States Treasury, ***Payne 22, Inc. v. United States,*** 762 F.2d 91, 94 (Temp. Emer. Ct. App. 1985); restitution by means of payments in kind to the Strategic Petroleum Reserve, ***Champlin Oil Co***., 47 Fed. Reg. 49703 (Nov. 2, 1982); and restitution by means of payments to state energy programs, ***United States v. Exxon***, 773 F.2d 1240 (Temp. Emer. Ct. App. 1985), ***cert. denied***, 474 U.S. 1105 (1986); *see also* ***Standard Oil Company (Ohio),*** 47 Fed. Reg. 49705 (November 2, 1982); ***Standard Oil of California (Chevron),*** 46 Fed. Reg. 52221 (October 26, 1981).

In 1986, within the context of a settlement agreement in ***In Re the Department of Energy Stripper Well Exemption Litigation***, 653 F. Supp. 108, 113 (D. Kan. 1986), DOE adopted a restitutionary policy for cases involving crude oil overcharges.   By the agreement, DOE resolved on a uniform basis the restitutionary issues for all crude oil overcharge recoveries obtained by DOE pursuant to its former oil price control enforcement authority under ESA § 209.  For claimants who were parties to the ***Stripper Well*** settlement, the agreement established a mechanism, through individual escrow accounts, for various groups -- including refiners, resellers of refined petroleum products, retailers of gasoline and diesel fuel, agricultural cooperatives, domestic airlines, investor-owned utilities, surface transporters, and rail and water transporters -- to receive a portion of the funds from a ***Stripper Well*** escrow.  In return, these parties were required to waive all existing and future claims to any other crude oil overcharges recovered by DOE.  ***In re DOE Stripper Well Exemption Litigation***, 653 F. Supp. at 112.

With respect to crude oil claims by non-parties to the ***Stripper Well*** settlement, such as plaintiffs herein, DOE agreed to issue a Modified Statement of Restitutionary Policy providing an opportunity for victims of overcharges to submit claims in refund proceedings pursuant to the agency's Subpart V procedures. *Energy Management* (CCH) ¶ 90,508A. *See also* 10 C.F.R. Part 205. To pay such claims, the agreement authorized OHA to reserve up to 20 percent of all crude oil overcharge funds in the agency's escrow. The remaining 80 percent, and any funds not otherwise distributed to claimants, are to be divided equally between the states (for use in specified energy-related programs) and the federal government as a form of indirect restitution. *See* Settlement Agreement, IV B, 2, 3, 6, reprinted in *Energy Management* (CCH) ¶ 90,509. Such indirect restitution is required in crude oil overcharge cases because, under DOE's former Entitlements Program, the cost of all crude oil, including overcharges, was effectively spread among all refiners and ultimately to all purchasers in the United States. *See **United States v. Exxon Corp.,*** 773 F.2d 1240, 1274, 1280-1286 (Temp. Emer. Ct. App. 1985), *cert. denied*, 474 U.S. 1105 (1986); ***In re Seneca Oil Co***., 906 F.2d 1445, 1446 (10th Cir. 1990).[3]

**B. The Crude Oil Refund Proceeding**

DOE implemented the ***Stripper Well*** settlement by issuing the required Modified Statement of Restitutionary Policy For Crude Oil Cases, 51 Fed. Reg. 27899 (August 4, 1986) (the "MSRP"), and announcing its intention to follow the MSRP in crude oil refund proceedings under Subpart V. OHA solicited comments concerning the appropriate procedures to be

---

[3] Shortly after the *Stripper Well* settlement was approved , Congress enacted the Petroleum Overcharge and Distribution Act of 1986 (PODRA). PODRA governs funds collected by DOE pursuant to the ESA section 209 responsibilities but expressly does not apply to "any amount to which any person or class of persons has an enforceable right * * * governed by the terms and conditions of [the Stripper Well Settlement] * * * '" 15 U.S.C. 4501(c) (1988).

employed in such cases, 51 Fed. Reg. 29689 (August 20, 1986), and subsequently issued a "Notice Explaining Procedures for Processing Refund Applications in Crude Oil Refund Proceedings Under 10 C.F.R. Part 205, Subpart V," 52 Fed. Reg. 11737 (April 10, 1987) ("OHA Notice").

With respect to the method for calculating refund amounts, the OHA Notice specified that the agency would employ a "volumetric method" for allocating overcharges. Under this method, the allocation of overcharges is made by dividing crude oil overcharge monies (the "numerator") by the total U.S. consumption of petroleum products during the period of price controls (the "denominator"). 52 Fed. Reg. at 11740. The resulting quotient is then attributed to each gallon of refined petroleum products sold while price controls were in effect.

The agency refund process anticipated that there would be several rounds of refunds. *See* 52 Fed. Reg. 11737 (April 10, 1987). The April 1987 Federal Register Notice stated: "It is clear that we are faced with a rolling process in which moneys will flow into and out of the escrow account as settlements are made and refunds determined. OHA will adhere to the Subpart V regulations which govern this process in order to give reasonable notice to the public of proposed refund procedures and to allow for the submission of applications for refund." 52 Fed. Reg. at 11739. In the initial "round" of refunds OHA paid successful claimants at the "volumetric" rate of $.0002 per gallon.

On April 11, 1989, OHA increased the cumulative volumetric amount to $.0008 per gallon and issued a round of supplemental crude oil refund checks to successful claimants who had been paid at the lower $.0002 rate. *Crude Oil Supplemental Refund Distribution*, 18 DOE ¶ 85,878 (1989).

On March 24, 1995, OHA announced that it would make another supplemental round of payments (at $.0008 per gallon) to prior successful crude oil refund claimants and that refund claims granted after March 3, 1995, would be granted at a new, increased volumetric amount of $.0016 per gallon. 60 Fed. Reg. 15562 (March 24, 1995).

On May 9, 2003, this Court issued a declaratory judgment that articulated DOE's obligation under existing departmental decisions to pay out refunds from the remaining crude oil funds collected by the DOE to individual refund claimants. ***Consolidated Edison Co. v. Abraham***, 271 F. Supp. 104 (D.D.C. 2003).

Immediately following the May 9 Decision OHA commenced planning for the final stage of this proceeding.  OHA published a Federal Register Notice on November 12, 2003.   68 Fed. Reg. 64098 (November 12, 2003). In this notice, OHA proposed to pay successful refund claimants a final supplemental refund at the rate of $ .00067 per gallon and outlined its proposed procedures for claimants to verify that the information on file for them was still correct.  The Notice solicited comments from all interested parties.

After considering all of the comments received pursuant to the November 12, 2003, Federal Register Notice, OHA announced final procedures for the distribution of the remaining crude oil overcharge monies.  69 Fed. Reg. 29300 (May 21, 2004). In this May 21, 2004 Federal Register Notice, OHA announced that the agency intended to make one single distribution of the crude oil funds to eligible claimants that would exhaust the crude oil funds and end the DOE's role in supervising these funds.

On January 13, 2006, OHA issued a notice in the Federal Register concerning its earlier announced plan to make a final, single distribution of the crude oil escrow funds for the purpose

of completing this portion of a larger regulatory program that had been eliminated in January

1981. 71 Fed. Reg. 2195 (January 13, 2006). OHA concluded that pending litigation, including

this case, will prevent it from making a single, last round of payments that would have allowed

the agency to "exhaust the remaining crude oil refund monies" and thereby bring to a conclusion

this seemingly unending program. 71 Fed. Reg. at 2195. Instead, OHA will distribute

approximately 90 % of the fund due to each eligible claimant , keeping the remainder to resolve

the pending issues in litigation. *Id.* Thus, all eligible claimants will not be able to receive

monies due them until this type of litigation is resolved. Perspective on this type of litigation is

gained from the comments of one interested party. A state, whose elgibility to receive a refund

is being challenged in some of the litigation that caused OHA to change its original plan, stated

that it had

> 'decided to earmark the supplemental crude refund
> [it would receive from OHA] to supplement the Low
> Income Energy Assistance Program' and that if it
> does not receive its refund at this time, it 'will be
> forced to reduce the 2005-2006 available funding for
> heating assistance benefits.'

71 Fed. Reg. 2196. That comment shows litigation is not simply an abstract endeavor but,

rather, often has harsh consequences in a world not comprised solely of pen, paper and novel

ideas.

## C.  Statement of Facts

National Steel filed a number of crude oil refund applications with OHA for purchases of

refined petroleum products during the period of August 19, 1973 through January 27, 1981, a

span commonly referred to as the "price control period." R. 392, 271-74. More specifically, on

June 2, 1989, National Steel sought a refund for its petroleum purchases at its Weirton, West

Virginia facility.  R. 392.  That request was denied by OHA based on an affiliated entity's

(Permian Corporation) participation in another crude oil refund proceeding, an action that made

National Steel ineligible to obtain a refund under OHA's program.  R.  392, 271-74.

In January 1984, National Steel sold the assets at its Weirton, West Virginia steel facility

to an employee group that had come together to form Weirton Steel.  Comp. ¶¶ 4, 15; R. 311-82.

Section 3.1 of that purchase agreement provided, in pertinent part, as follows:

> **Refunds, Rebates, etc.**
>
> The Seller [National Steel] will retain for its own account
> any payments received from Columbia Gas, Conrail or any
> other Person representing overcharges or refunds prior to
> the Purchase date [January 11, 1984].

R. 319.  The agreement defines the word "Person" as including "a government or any agency or

political subdivision thereof."  R. 373.

Section 7.2 of the purchase agreement provides, in pertinent part, as follows:

> Proceedings Based on Facts Prior to the Purchase Date
>
> Except as provided otherwise in this Article, the Seller
> [National Steel] will take full responsibility for, conduct
> at its own expense, discharge any liability relating to,
> and retain any recovery from, all Proceedings which
> are not Pending Proceedings, to the extent such
> Proceedings involve claims based on facts
> occurring or existing prior to the Purchase Date
> [January 11, 1984].

R. 328.  The agreement defines "Pending Proceedings" to mean those "Proceedings listed on

Schedule D" to the agreement.  R. 372.  The "Pending Proceedings" listed in Schedule D to the

agreement, which the Plaintiff alleges Weirton Steel received from National Steel under the

agreement, did not include OHA's crude oil refund proceedings.  R. 383-91.

11

In June 1989, or some 5 years after it had entered into the asset purchase agreement with Weirton Steel, National Steel submitted an application to OHA for a crude oil refund for purchases made for its Weirton facility during the price control period.  R. 392; 271-74. According to the Plaintiff's allegations, National Steel was "unaware that it was acting as an agent" for Weirton at the time that National Steel filed the application for a crude oil refund. Comp.  ¶ 20.

In February 2004, Weirton Steel entered into an asset purchase agreement with the Plaintiff.  Comp. ¶ 23; R 344-57.  Weirton Steel was, according to the Plaintiff, "evidently equally unaware" that it had the right to a crude oil refund for purchases made at the Weirton facility when that plant was owned by National Steel.  Comp. ¶ 22.  Weirton Steel was apparently so "unaware" of its right that it never filed a claim with OHA for a refund.  Indeed, it appears that even the Plaintiff also did not know that it had purchased Weirton Steel's alleged right to a crude oil refund until "it [was] called to [the Plaintiff's] attention," at which point the Plaintiff filed a claim with OHA for a refund.  Comp. ¶ 24.  That claim was denied by OHA upon a finding that National Steel did not sell or transfer to Weirton Steel any potential right to a crude oil refund from OHA.  R. 393-95.

## III.  <u>STANDARD OF REVIEW</u>

Congress established the TECA in Section 211(b)(2) of the ESA as the federal court of appeals with exclusive jurisdiction over appeals from district courts of cases and controversies arising under the ESA or under regulations or orders issued thereunder.  Through incorporation of Section 211(b)(2) of the ESA by Section 5(a)(1) of the EPAA.  Congress also established TECA as the federal court of appeals with exclusive jurisdiction over appeals arising from

decisions involving EPAA issues.  TECA, however, was abolished on April 29, 1993, and its

exclusive appellate jurisdiction over EPAA issues was transferred to the United States Court of

Appeals for the Federal Circuit.  See Federal Courts Administration Act of 1992, Pub. L. No.

102-572, 106 Stat. 4506 (1992).  The Federal Circuit has adopted the precedents of the TECA as

its own.  *Texas American Oil Corp. v. Department of Energy*, 44 F.3d 1557 (Fed. Cir. 1995);

*see also **Phoenix Petroleum Co. v. Federal Energy Regulatory Comm'n**, 95 F.3d 1555 (Fed.

Cir. 1996).

The standard for review of OHA's decision in this case is set forth in ***Phoenix Petroleum

Co.***, 95 F.3d at 1567, as follows:

> Thus, this court must necessarily apply a standard of review.  We
> see no reason to deviate from the standard of review applied by
> the TECA.  As stated in *MAPCO*, the court will set aside an
> EPAA/ESA agency action if it is in excess of the agency's
> authority, or is based upon findings which are not supported
> by substantial evidence.  We recognize DOE's administrative
> expertise, accord the agency's determination great deference,
> and must approve the DOE decision if there is a rational basis
> for it.  *MAPCO*, 998 F.2d 239.

This in accord with earlier TECA precedent in ***International Drilling and Energy Corp. v.

Watkins***, 920 F.2d 14 (Temp. Emer. Ct. App. 1990).  The court stated in that case, as follows:

> Judicial review of an administrative order of the DOE
> is statutorily established by the Economic Stabilization Act of
> 1970 (ESA).  Section 211(d)(1) of the ESA provides that no
> order shall be set aside "unless a final judgment determines
> that such an order is in excess of the agency's authority, or is
> based upon findings which are not supported by substantial
> evidence."  12 U.S.C. § 1904 note, incorporated by reference
> in the Emergency Petroleum Allocation Act of 1973 [EPAA],
> 15 U.S.C. § 754(a)(1). [footnote omitted] The court's role in
> this judicial review is guided by certain well settled principles:

13

> A court should recognize the administrative
> expertise of an agency decision maker and
> consequently accord the agency's determination
> "great deference." [citations omitted]  Thus, "the
> judicial role requires approval of the DOE's
> decision if there is a rational basis for it."
> [citation omitted]

*Id.* at 18.  Further, OHA is accorded great deference in administering its own regulations and

procedures.  See *Sinclair Oil Corp. v. Abraham*, 291 F.3d 822, 826-27 (Fed. Cir. 2002).  The

Plaintiff's challenge, therefore, must be reviewed in light of this standard of deference being

accorded to OHA's decision.

## IV.  ARGUMENT

**The Federal Defendants Are Entitled to Summary Judgment
As A Matter Of Law Because OHA's Decision Is Supported
By Substantial Evidence And Has A Rational Basis**

To state the facts is to decide this case.  The Plaintiff's entire case rests on the premise

that the "right" it now claims was transferred from National Steel to Weirton Steel in 1984 and

that Weirton Steel sold that right to the Plaintiff in 2004.  The documents the Plaintiff submitted

to OHA in support of its application, however, show clearly that there was no such transfer by

National Steel to Weirton Steel.  It necessarily follows, then, that Weirton Steel had no "right"it

could transfer to the Plaintiff.

Sections 3.1 of that agreement proves that National Steel retained any right it had to a

refund from the crude oil refund proceedings.  R. 319-20.  Indeed, that provision affirmatively

required Weirton Steel to remit any such refund that Weirton Steel might have received to

National Steel.  R. 319.  The only type of refund that Weirton Steel would have been entitled to

was one "earned . . . subsequent to" the purchase date in January 1984.  R. 320.  As OHA stated,

the refund proceedings generally related to "overcharges" made during the "period August 1973 through January 1981." R. 394. That plainly shows that the agreement between National Steel and Weirton Steel did not include the right to a refund in the OHA crude oil proceedings.

Furthermore, Section 7.2 of the agreement also shows that National Steel did not transfer any right it may have had to a crude oil refund to Weirton Steel. This provision expressly provides that National Steel retained "full responsibility" for all "Proceedings [that] involve claims based on facts occurring or existing prior to the" date of purchase in January 1984. R. 328. As OHA found, the "facts" that would have formed the basis of any claim owned by National Steel occurred "*before* the purchase date" in 1984, because such "facts" were the purchases of covered petroleum products [by National Steel] during the period August 1973 through January 1981." R. 394.

The evidence supporting OHA's decision is not just "substantial," as is required by the applicable statute. We submit that it is overwhelming. This evidence, in fact was provided by the Plaintiff in its own submissions to OHA in support of its motion. R. 293-391. It is also useful to note at this point that three firms involved in this matter all thought that National Steel retained the right to file a claim for a refund. National Steel surely did when it filed its application with OHA in 1989. R. 392, 271-74. It is also fair to infer that Weirton Steel, an employee owned entity that one could reasonably believe was formed to stave off the closure of the Weirton facility by acquiring the plant's assets from National Steel, apparently thought that National Steel owned the claim since Weirton Steel never filed such a claim. Finally, one could

say that even the Plaintiff was initially "unaware" that it owned this valuable right[4] since it did not file a claim until that right was "called to [its] attention." Comp. ¶ 24.

OHA is required to have a rational basis for its decisions. ***International Drilling and Energy Corp.***, 930 F.2d at 18. There can be no doubt that OHA had a rational basis for its rejection of the Plaintiff's request for a refund. The Plaintiff's own submissions showed that National Steel did not transfer any right it had to a refund to Weirton Steel, which is the *sine qua non* of the Plaintiff's claims. Indeed, the Plaintiff's own submissions provided the overwhelming evidence for OHA to conclude that National Steel did not transfer that right. Therefore, there was a rational basis for OHA to reject the Plaintiff's application because the Plaintiff did not have a claim to make.

Moreover, since OHA's decision has a rational basis, controlling precedent shows that OHA's decision should be accorded deference. ***Phoenix Petroleum Co.***, 95 F.3d at 1567; ***International Drilling and Energy Corp.***, 920 F.2d at 18. Deference should also be accorded to the agency administration of it own regulations and procedures. ***Sinclair Oil Corp. v. Abraham***, 291 F.3d 822, 826-17 (Fed. Cir. 2002). Deference must be accorded to OHA in this case since it was interpreting and applying the multiple policy statements it has issued, see **II. STATEMENT**, **B. The Crude Oil Refund Proceeding**, *supra*, concerning refunds made under the crude oil refund proceeding. In applying its policy statement to the Plaintiff's application, for example, OHA stated that its "crude oil refund proceeding seeks to provide restitution for petroleum product overcharges for purchases made during the period August 1973 through

---

[4] In its submissions to OHA, the Plaintiff estimated that it is entitled to approximately $1,400,000.

16

January 1981." R. 394. In addition, in reviewing the "claim" Plaintiff now argues it owns, OHA interpreted its crude oil refund policies in light of another agency crude oil refund program as the basis of denying National Steel's 1989 refund application, finding that actions of one of National Steel's affiliates barred National Steel from obtaining a refund under OHA's crude oil proceeding. R. 392. Those agency actions must be accorded deference based on controlling precedent. The failure to do so would likely give the green light to an untold number of newly discovered ancient claims for refunds based on novel theories, all of which would have the potential to undue decades of decisions issued by OHA in the crude oil refund program. That is a result that the Court should avoid, especially in a case where, as here, it is clear that there is a rational basis for the agency's decision[5]

---

[5] Although the question of whether the Plaintiff had standing to assert the claim at issue here was not discussed in the agency's decision, if the government is correct in concluding that National Steel did not transfer to Weirton Steel any "right" National Steel may have had to seek a refund from OHA, then it seems clear that Plaintiff did not have standing to assert the "right" to OHA. The fact that National Steel was barred from asserting any such "right" because one of its affiliates thereafter participated in another refund program does not change the analysis that the Plaintiff can only assert that which it received from Weirton Steel. If the Plaintiff did not receive the right to file such claim, then it has no standing in any forum to assert the claim, which is a jurisdictional issue.

## V.  CONCLUSION

Based on the forgoing reasons, the Federal Defendants respectfully submit that the Court should grant their motion for summary judgment and dismiss the Plaintiff's Complaint with prejudice.

Respectfully submitted,

_____

PAUL T. MICHAEL (202) 586-1303
STEPHEN C. SKUBEL (202) 586-5579
United States Department of Energy
Office of the General Counsel
Room 6H-087 (GC-32)
1000 Independence Ave., S.W.
Washington, D.C. 20585
Telephone: (202) 586-8700

DATE: January 20, 2006