IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

MITTAL STEEL USA ISG, INC.
4020 Kinross Lakes Parkway
Richfield, OH 44286

      Plaintiff

        V.                                          CIVIL ACTION NO.

SAMUEL BODMAN                                   05-1466(ESH)
Secretary of Energy, United States
1000 Independence Ave. S.W.
Washington DC 20585

GEORGE B. BREZNAY
Director, Office of Hearings and Appeals
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington DC 20585

      Defendants
_____

STATEMENT OF MATERIAL FACTS IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff submits the following facts as those material
to its accompanying Motion for Summary Judgment and Statement
of Points and Authorities In Support. Plaintiff asserts that
there is no genuine issue with respect to such facts:

1

THE REGULATION OF PETROLEUM AND THE PROVISIONS FOR REFUNDS

1. The price charged by producers and resellers of crude oil, and the price of products refined from that crude oil charged by refiners, resellers and retailers were regulated by the Department of Energy (and its predecessor agencies) during the August 1973 through January 1981 period. (Price regulation of crude oil extended through the entire period, while the length of time during that period in which the price of various petroleum products, e.g. gasoline, home heating fuel, airplane fuel etc. was limited by regulation varied).

2. The price regulation was pursuant to authority granted by Section 209 of the  Economic Stabilization Act Amendments of 1971, ("ESA"), Pub. L. 92-210,85 Stat. 743 (1971) as incorporated in the Emergency Petroleum and Allocation Act ("EPAA"), Pub. L. 93-259, 87 Stat. 627 (1973). ESA Section 209 authorized the United States to enforce the price regulations through judicial proceedings (later extended to provide for enforcement in administrative proceedings), and to recover overcharges for "restitution."

3. Prior to deregulation (in January 1981 as to crude oil, and earlier as to some of the petroleum products), overcharges were effectuated by reductions in the price which the regulatory violator was permitted to charge. Upon

2

deregulation, such was no longer possible.

4. The question of how to make "restitution" was fairly easily resolved in the case of refined products. Upon recovery by the DOE of overcharges, DOE sought to identify the customers who had purchased the product as to which the overcharges (by the refiner, reseller or retailer) occurred and provided a claims process pursuant to which such customers could claim an appropriate share of the recovered funds (in general, the amount per gallon each was entitled to was calculated by dividing the recovered funds by the volume of sales affected by the overcharge).

5. Making "restitution" after deregulation proved much more difficult for DOE as to crude oil overcharges (overcharges by producers of crude oil or by resellers who purchased crude). The difficulty occurred because under the regulatory system when a particular producer overcharged the refiner to which it sold its crude oil, the overcharge was spread to all refiners of the United States through a program called the Entitlements Program. The Entitlements Program was adopted to enable all refiners to have the advantage of lower price domestic oil to the same extent; in effect, refiners with a lower average cost of crude oil because of a higher percentage of that crude being purchased from domestic price-

regulated producers were required to subsidize refiners with a higher average acquisition cost because of a higher percentage of their crude being purchased from unregulated foreign producers. The result of the Entitlements Program was that all refiners had essentially the same per barrel crude oil acquisition cost, and any overcharge to a refiner by a producer was effectively shared pro rata by all domestic refiners.

6. DOE faced multiple demands for "restitution" of crude oil refunds which DOE had recovered and was seeking to recover:

(i) The Refiners of the United States who paid the overcharge in the first place, and shared the overcharge pro rata through the Entitlements Program, asserted that they were entitled to the refunds because they had paid the overcharges and had not been able to pass the overcharges along to resellers, retailers or the end users who consumed the petroleum products;

(ii) The resellers and retailers asserted that the Refiners had in fact increased their prices to cover the overcharges and that as resellers and/or retailers they had been unable to pass along the overcharges by increasing their prices, and were therefore entitled to the refunds recovered

by DOE;

(iii) The end users of petroleum products e.g. airlines, utilities, manufacturers, asserted that in fact the refiners, resellers and retailers had passed long the overcharges in higher prices, that they, the end users, had been unable to pass along in the price of the products which they had made by the consumption or use of the petroleum products they had purchased, and that they were therefore entitled to the refunds;

(iv) Both the States of the United States and the federal government asserted their right to all the crude oil refunds (the States to the exclusion of the federal government, and the federal government to the exclusion of the States) in their capacity as <u>parens patriae</u> on behalf of their citizens, arguing that such would best effectuate "restitution."

7. The battle waged for five years, from 1981 through 1986. During that period, there was no procedure provided for any of the claimants to seek recovery of the crude oil refunds which the DOE was in the process of recovering. The DOE (in the provisions of settlements with some of the alleged overchargers),the Courts (in some of the cases in which DOE recovered from producers), and Congress (by legislative appropriation) provided for the use of some of the crude oil

refunds which the DOE had recovered for various federal government purposes-- by distributing some of the recovered crude oil funds to the States to fund a federal program providing assistance for home heating to persons with low incomes (see e.g. United States v. Exxon, 773 F. 2d 1240 (TECA 1985), Warner Amendment, Pub. L. No. 93-377 Sec. 155, 96 Stat. 1830 (1982)), by distributing some of the funds to the U. S. Treasury for appropriation by the federal government (See, e.g. Payne 22 Inc. V. United States, 762F. 2d 81 (TECA 1985), Cities Service Co. V. DOE, 715 F. 2d 572 (TECA 1983)), and directing the use of some of the funds to purchase oil for the Strategic Petroleum Oil Reserve. However, a substantial portion of the recovered funds were held by DOE pending determination as to their distribution (See, e.g. Ashland Oil Inc. V. DOE, 760 F. 2d 298 (TECA 1985), Alkek/Adams, 9 DOE (CCH) par. 82,553 (1982)).

8. When, during that period, end users of petroleum products sought to preclude diversion of the funds for federal programs and to claim from the funds, they were rebuffed.

9. DOE continued to resist adopting any claims program. Indeed, in July, 1985, in a formal policy statement, the DOE confirmed its past determination to reject the claims of others and advised that as parens patriae it would retain the

recovered crude oil refunds in its control for use by the
federal government. (Statement of Restitutionary Policy, 7
Energy Mgmt. (CCH) par. 90,508, 50 Fed. Reg. 27,400, July 2,
1985). DOE had determined in that Policy statement that it
would retain recovered crude oil refunds, and not have a
claims procedure, even after completing an economic analysis
of the impact of crude oil overcharges which it had made at
the direction of the District Court in In re The Department of
Energy Stripper Well Exemption Litigation, 578 F. Supp. 586,
595-97 (D. Kan. 1983). (In that litigation, dealing with crude
oil refunds in the Court's control rather than with crude oil
refunds in the DOE's control, the DOE and the States of the
United States made conflicting parens patriae claim for 100%
of the funds, while the Refiners of the United States asserted
their entitlement to 100% of the crude oil refunds in the
Court's control, and representative resellers, retailers and
end users (e.g. domestic airlines, farmer cooperatives,
truckers and utilities) claimed their right to the crude oil
refunds in the Court's control.

    10. It was not until August 1986, in a settlement
approved by the Court in In re The Department of Energy
Stripper Well Exemption Litigation ("Stripper Well"), 653 F.
Supp. 108 (D. Kan. 1986), that the DOE agreed to allocate a

7

portion of the crude oil refunds in the <u>Stripper Well</u> Court's control to the Refiners, resellers, retailers, the States (for use in energy programs approved by the DOE), and end user claimants electing to participate in that proceeding, and to retain for the U.S. Treasury only a part of the funds.

11. As part of that Settlement Agreement, as to crude oil refunds in its control, DOE agreed for the first time to adopt a program which permitted end user claimants, such as steel manufacturers, to make claims against the crude oil refunds which the DOE had recovered and would recover. For that purpose, DOE created a reserve of 20% of the crude oil refunds it had recovered, dividing the other 80% equally between the States and the U.S. Treasury.

12. Thus, as it relates to the instant matter, it was not until the execution of the <u>Stripper Well</u> Settlement Agreement and the issuance, as required by that Settlement Agreement, of a Statement of Modified Restitutionary Policy, 51 Fed. Reg. 27,899 (1986), 7 Energy Mgmt. (CCH) par. 90,508 A, that manufacturers such as steel plant operators obtained the right to make a claim for crude oil refunds on the basis of refined petroleum products purchased for manufacturing use during the 1973-1981 regulatory period. (Because manufacturers were not parties in <u>Stripper Well</u>, they were not eligible to recover

8

from the crude oil refunds in the Court's control in that case.)

13. When such a right to claim the crude oil refunds which the DOE had recovered, and was continuing in enforcement actions to recover, was created, the claimant was required only to demonstrate that he had purchased refined product during the period of regulation of crude oil, and its volume; the identity of the refiner or reseller from which the petroleum product had been purchased was of no consequence because of a DOE determination that an overcharge by one refiner affected all refiners equally.

14. Another provision of the ESA, Section 210, provided for a private cause of action by one asserting that he had been overcharged, an action which could be brought only against the vendor who had sold the product to him. In the case of an end user such as a steel manufacturer whose purchases were necessarily of refined petroleum products, not crude oil, ESA Section 210 provided no way of leaping over a vendor and seeking refunds from a crude producer.

THE PROVISIONS OF THE AGREEMENT BETWEEN NATIONAL STEEL AND WEIRTON STEEL WHICH ARE RELEVANT TO DETERMINE WHICH ONE OF THEM WAS ENTITLED TO REFUNDS RECOVERED BY THE DOE

15. Two provisions of an Assignment and Assumption

9

Agreement (" A & A Agreement") between National Steel and
Weirton Steel are arguably relevant to overcharges in refined
petroleum products (overcharges by refiners, resellers or
retailers) and crude oil overcharges (overcharges by producers
or resellers of crude oil):

(i) Section 3.1 provides for an allocation as between
National Steel Corporation and Weirton Steel Corporation of
any "rebate, refund or reduction in rates from The Columbia
Gas System, Inc ("Columbia Gas"), Consolidated Rail
Corporation or any other Person." It provides that National
Steel may "retain for its own account any payments received
from Columbia Gas, Conrail or any other Person representing
overcharges or refunds prior to the Purchase Date."
(Administrative Record ("AR") at 319-320).

(ii)  Section 7.2 allocates to National Steel "any
recovery from, all Proceedings which are not Pending
Proceedings, to the extent such Proceedings involve claims
based on facts occurring or existing prior to the Purchase
Date." (A.R. at 328). Section 7.4 allocates to Weirton Steel
"any recovery from,  all Proceedings to the extent such
Proceedings involve claims based on facts occurring on or
after the Purchase Date." (A.R. at 329).
(In the relevant Glossary, "Proceedings" are defined as

10

including "any claim of the (Weirton) Division against any

person... or request for relief which may be brought in any...

administrative agency", and "person" is defined as including

"a government or any agency or political subdivision

thereof."). (A.R. 341-342).

THE HISTORY OF THE APPLICATION FOR CRUDE OIL REFUNDS ON THE

BASIS OF REFINED PRODUCTS PURCHASED AT THE WEIRTON STEEL PLANT

16. On June 2, 1989, "National Steel Corporation Weirton

Steel Division" filed with OHA an application for crude oil

refunds based upon purchase of 609,873,867 gallons of No. 6

residual fuel oil (A.R. 2-3). It was docketed as RF 272-75497,

and captioned by OHA as "National Steel Corp./Weirton. Shortly

thereafter, in July, 1989, applications were filed for

purchases at two other National Steel Corporation facilities,

National Steel Corporation-Midwest Steel Division, and

National Steel Corporation, Great Lakes Steel Division (A.R.

4-9). Two years previously, in July, 1987 an application was

filed by National Steel Corporation for its Granite City

operations.

17. By Decision and Order issued March 1, 1991, OHA

denied all four applications filed by National Steel

Corporation. (A.R. 271-275). It did so on the basis of a

Waiver and Release executed by the Permian Corporation

("Permian") September 12, 1986 in connection with a recovery by Permian of funds from the Surface Transporters Escrow created from funds in the Court's control pursuant to the Settlement Agreement in In re The Department of Energy Stripper Well Exemption Litigation, 653 F. Supp. 108 (D. Kan. 1986). OHA interpreted the Waiver and Release as barring recovery of crude oil refunds in the DOE crude oil refund proceedings by any affiliate of Permian. It found that National Steel Corporation was such an "affiliate" of Permian because (i) "National Intergroup, Inc. (NII) had owned 50 percent of National Steel Corporation since 1984, and (ii) "in 1985, NII acquired the Permian Corporation."

18. In denying the application of National Steel Corporation for crude oil refunds based on purchases for the Weirton facility, OHA was unaware that National Steel Corporation was not itself a principal entitled to the crude oil refunds on the basis of the Weirton facility purchases, but was merely acting as an agent for the Weirton Steel Corporation which was entitled to such refunds pursuant to the A & A Agreement. Presumably, National Steel Corporation was equally unaware that it was acting as an agent, believing it to be entitled to the refunds for Weirton purchases because it had operated the facility at the time the purchases were made;

12

evidently, it was not sufficiently familiar with the history
of the crude oil refund program to understand that the
critical "fact" which was requisite for recovery of crude oil
refunds-- the creation of a claimant's right to crude oil
refunds-- did not occur until more than two years after its
sale of the Weirton Steel assets to the Weirton Steel
Corporation, and therefore, it was the Weirton Steel
Corporation, not National Steel Corporation, which was
entitled to the crude oil refunds on the basis of the Weirton
purchases of refined petroleum product.

19. The Weirton Steel Corporation was not an affiliate
of Permian when Permian executed the Waiver and Release.

20. Weirton Steel Corporation was evidently equally
unaware that it, not National Steel Corporation, was entitled
to crude oil refunds based on purchases for the Weirton
facility, presumably for the same reason, i.e. its
unfamiliarity with the history of the creation of the right to
crude oil refunds. Presumably for that reason, it did not
itself assert a claim for crude oil refunds, nor did it seek
reconsideration of the denial of refunds to National Steel for
the Weirton operations.

21. By an Amended and Restated Asset Purchase Agreement,
dated February 25, 2004, Weirton Steel Corporation sold to

13

International Steel Group Inc. ("ISG") "All of the properties, assets and rights of Sellers (Weirton Steel Corporation), wherever located, whether real of personal, tangible or intangible, existing or hereafter acquired and whether or not reflected on the books or financial statements of Sellers, excluding only the Excluded Assets, including without limitation...

"(m) except as provided in Section 1.2 ©) and Section 1.2 (d) all Claims of Sellers."

The specific exclusions do not include the right to crude oil refund claims. Section 1.2 ©) excludes only claims for refunds, overpayments or rebates of taxes and duties imposed on imported steel. Section 1.2 (d) excludes only claims arising under the Bankruptcy Code or similar state law, claims already filed by Sellers in court, and claims "not relating to any Acquired Asset or Assumed Liability," including claims arising from or related to certain sections of the Bankruptcy Code. The claim for crude oil refunds is one "relating to an(y) Acquired Asset", i.e. the "equipment" and "machinery" which was being sold and in which the fuel had been used on the basis of which the right to claim crude oil refunds exists. (A.R. 344-357)

14

22. Later in the same year of its acquisition of the crude oil refund rights of Weirton Steel Corporation, and upon having it called to ISG's attention that it had the right to assert Weirton Steel Corporation's crude oil refund rights, ISG moved for reconsideration by OHA of its prior denial of the application of National Steel Corporation/Weirton. It did so on the basis that, as a matter of law, National Steel Corporation had been acting as an agent, not as a principal in seeking refunds for its purchases at Weirton because it was Weirton Steel Corporation, not National Steel Corporation, which had the right to claim crude oil refunds for the Weirton operations, and therefore, OHA improperly denied the claim of National Steel Corporation/Weirton on the basis of Permian's execution of a waiver. The Motion for Reconsideration sought the award of crude oil refunds to ISG for the purchases of refined petroleum product at Weirton for which application had been made by National Steel Corporation.( A.R. 286-309)

23. By Decision and Order issued June 1, 2005, OHA denied the ISG Motion for Reconsideration, doing so on two bases: (i) the Motion for Reconsideration was "filed too late,", and (ii) pursuant to the Assignment and Assumption Agreement between National Steel Corporation and Weirton Steel

15

Corporation, the right to claim crude oil refunds belonged to National Steel Corporation and not to Weirton Steel Corporation, and accordingly was not conveyed to ISG by Weirton Steel Corporation. A.R. 392-395)    More specifically,

(i) in finding the Motion for Reconsideration was not timely filed, OHA acknowledges that it has considered motions for reconsideration in the past, and relies for its finding of untimeliness here on the fact that the Motion for Reconsideration was here filed after the final filing deadline for crude oil refund applications, i.e. June 30, 1995. OHA does not suggest that the 1995 announcement of a deadline for filing claims in any way advised that such would also be a deadline for filing motions for reconsideration. Moreover, OHA has indeed considered and granted motions for reconsideration filed not only after the filing deadline for claims, but almost three years after the applicant was in a position to seek reconsideration. See, e.g. <u>Hercules Incorporated</u>, RR272-00204; here, the Motion for Reconsideration was filed within a year of ISG's obtaining the ownership of such claim and therefore the right to seek reconsideration. Moreover, to the best of the appellants' knowledge, OHA has never refused to make a merits determination on a Motion for Reconsideration.

16

(ii) in holding that the A & A Agreement retained for National Steel Corporation the right to claim crude oil refunds, OHA (1) fails to recognize that the provision retaining for National Steel Corporation any refunds or rebates (Section 3.1) is inapplicable because the provision deals with situations in which a vender remits a portion of the purchase price, while here the acknowledged source of refunds is a third party, the DOE, and refunds are of overcharges by parties with whom the refined product purchaser had no relationship, i.e. producers and crude oil resellers, and (2) in considering the allocation of funds recovered in "Proceedings" (Sections 7.2 and 7.4), OHA fails to recognize that one of the essential "facts" giving rise to the right to recover crude oil refunds, i.e. the creation of a claimants right to refunds, did not occur until long after the sale of the Weirton facility to Weirton Steel Corporation, thereby making Weirton Steel Corporation the party entitled to the crude oil refunds obtained in the Proceedings before OHA.

17

Respectfully submitted,


_____

Philip P. Kalodner
208 Righters Mill Road
Gladwyne PA 19035
DC Bar 973578

Attorney for Plaintiff

February 16, 2006