IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MITTAL STEEL USA ISG, INC.
4020 Kinross Lakes Parkway
Richfield, OH 44286


        Plaintiff

            v.                          CIVIL ACTION NO.

SAMUEL BODMAN                           05-1466(ESH)
Secretary of Energy, United States
1000 Independence Ave. S.W.
Washington DC 20585

GEORGE B. BREZNAY
Director, Office of Hearings and Appeals
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington DC 20585


        Defendants
_____


STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT




                          Philip P. Kalodner
                          208 Righters Mill Road
                          Gladwyne PA 19035
                          DC Bar 973578

February 16, 2006         Attorney for Plaintiff

TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT                    1

STATEMENT OF FACTS                                     7

    THE REGULATION OF PETROLEUM AND THE
    PROVISIONS FOR REFUNDS                             7

    THE PROVISIONS OF THE A & A AGREEMENT
    ARGUABLY RELEVANT TO REFUNDS OF REFINED
    PRODUCT AND CRUDE OIL OVERCHARGES                  14

    THE HISTORY OF THE APPLICATION FOR CRUDE
    OIL REFUNDS ON THE BASIS OF REFINED PRODUCTS
    PURCHASED AT THE WEIRTON STEEL PLANT               16

ARGUMENT                                               20

I    THE COURT'S INTERPRETATION OF THE AGREEMENT
BETWEEN NATIONAL STEEL AND WEIRTON STEEL TO
DETERMINE WHETHER NATIONAL STEEL WAS THE OWNER OF
THE RIGHT TO CRUDE OIL REFUNDS OR MERELY AN AGENT
FOR WEIRTON STEEL IS DE NOVO; NO DEFERENCE IS DUE
TO OHA OR DOE                                          21

II    THE APPLICABLE PROVISIONS OF THE A & A
AGREEMENT ARE 7.2 AND 7.4, NOT 3.1, AND UNDER
SECTIONS 7.2 AND 7.4, THE RIGHT TO CRUDE OIL REFUND
CLAIMS IS IN WEIRTON STEEL, NOT NATIONAL STEEL         24

III    ISG IS ENTITLED AS SUCCESSOR TO WEIRTON STEEL
TO SEEK RECONSIDERATION OF THE DENIAL OF CRUDE OIL
REFUNDS TO NATIONAL STEEL; THE WAIVER BY NATIONAL
STEEL'S AFFILIATE DOES NOT PRECLUDE A RECOVERY
BY ISG AS WEIRTON STEEL'S SUCCESSOR                    38

CONCLUSION                                             43

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MITTAL STEEL USA ISG, INC.
4020 Kinross Lakes Parkway
Richfield, OH 44286

     Plaintiff

       V.                         CIVIL ACTION NO.

SAMUEL BODMAN             05-1466(ESH)
Secretary of Energy, United States
1000 Independence Ave. S.W.
Washington DC 20585

GEORGE B. BREZNAY
Director, Office of Hearings and Appeals
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington DC 20585

     Defendants

 

STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

INTRODUCTION AND SUMMARY OF ARGUMENT

    Plaintiff Mittal Steel USA, ISG, Inc. ("ISG") is the
owner and operator of a steel manufacturing facility located
at Weirton, West Virginia, having acquired the plant in
February, 2005 from Weirton Steel Corporation ("Weirton
Steel"), and by virtue of such acquisition is entitled to any

1

crude oil refunds  being distributed by DOE to which Weirton Steel is entitled.

An application was timely filed with DOE in 1989 seeking such refunds on the basis of purchases of refined petroleum products for use at the Weirton facility by National Steel Corporation ("National Steel") which had owned the Weirton facility at the time of the product purchases on the basis of which the crude oil refunds were properly sought, i.e. August 1973 through January 1981. In its 1989 application, National Steel asserted its right to the refunds as the principal entitled to them. The application was denied by OHA in a decision issued March 1, 1991, on the basis of a Waiver and Release which had been executed by Permian Corporation ("Permian") an affiliate of National Steel Corporation, in connection with a recovery of crude oil refunds by Permian for Permian's own purchases of refined petroleum product.

In fact, both National Steel and OHA were incorrect in treating National Steel as the principal seeking the refunds.

National Steel had sold the Weirton facility on May 1, 1983, to Weirton Steel, an employee owned company, by an Agreement pursuant to which it was Weirton Steel which owned the right to any crude oil refunds at the time National Steel made application for such refunds.

2

Accordingly, National Steel was properly deemed to be seeking such refunds not as a principal entitled to them, but instead as an agent for Weirton Steel which was entitled to the refunds.

Had OHA recognized that National Steel was acting as an agent not as principal, and that the principal was Weirton Steel, the Waiver and Release executed by Permian (more than three years after the sale of the Weirton facility by National Steel to Weirton Steel), would not have been deemed a waiver of Weirton Steel's right to crude oil refunds; Weirton Steel was not an affiliate of Permian and accordingly would not have been deemed disqualified by Permian's waiver of the crude oil refund rights of any of its affiliates.

When, within less than a year after its purchase of the Weirton facility, and with it the right to any crude oil refunds to which Weirton Steel was entitled, ISG recognized that National Steel had been in fact acting as an agent and had therefore been improperly disqualified as a crude oil refund claimant, it sought reconsideration of the denial of crude oil refunds to National Steel.

This litigation is an appeal from OHA's denial of that motion for reconsideration.

The issue for the Court's consideration is whether OHA's

interpretation of the Assignment and Assumption Agreement ("A & Agreement") between National Steel and Weirton Steel-- i.e. that National Steel retained any right to crude oil refunds-- is correct, or whether ISG is correct in asserting that under the A & A Agreement, it was Weirton Steel which had the right to any crude oil refunds.

More specifically, the issue is, in ISG's view, dependent on the interpretation of language in the A & A Agreement which provides that "The Buyer (Weirton Steel) will... retain any recovery from all Proceedings (here the crude oil refund proceedings) to the extent such Proceedings involve claims based on <u>facts</u> occurring on or after the Purchase date (May 1, 1993)" (Section 7.4 of the A & A Agreement, emphasis supplied.)

Three "<u>facts</u>" all must occur in order for there to be a "recovery" in "Proceedings" which "involve claims", i.e. recovery of crude oil refunds by a purchaser of refined petroleum products in proceedings before the DOE, i.e.:

(I) The claimant, or its predecessor, must have purchased the refined petroleum products on the basis of which the claim is made during the relevant period, i.e. August, 1973 through January, 1981 ;

(ii) DOE must have recovered the refunds which are sought

4

in the "Proceedings";

(iii) The right to claim crude oil refunds must have been created.

This third "fact," i.e. the existence of a right to claim crude oil refunds, was not a "fact" as of either the Purchase Date (May 1, 1983) or the closing date (January 1984) of the National Steel-Weirton Steel transaction.

It became a "fact" only with the creation of the right to claim in the latter part of 1986.

Accordingly, the claim for crude oil refunds here was "based on facts occurring... after the Purchase Date," and the right to "recovery" from "Proceedings" involving such a claim was a right belonging to the Buyer, Weirton Steel Corporation.

This Court's interpretation of the relevant language, more precisely of the word "facts", is one to be made de novo, with no deference due to OHA's interpretation.

In its Decision, OHA does not question the ISG assertion that if the right to crude oil refunds belonged to Weirton Steel, National Steel is properly deemed to have been acting as an agent for Weirton Steel, and as an agent, a Waiver executed by its affiliate Permian did not disqualify Weirton Steel, and therefore reconsideration of the denial of a refund is appropriate. Nor does OHA dispute ISG's contention that

5

under its agreement with Weirton Steel, ISG has any right to crude oil refunds to which Weirton Steel was entitled, and therefore the right to seek reconsideration of the denial of the claim made on Weirton Steel's behalf by its agent, National Steel.

Finally, although OHA suggested as an alternative basis for is denial of the ISG motion for reconsideration that "it was filed too late", DOE has abandoned that basis for rejection of reconsideration: "The Federal Defendants do not assert here the issue of whether the Plaintiff's claim was timely but, instead, seek to dismiss the complaint only on the ground that it is without merit." Federal Defendants' Memorandum In Support of Their Motion for Summary Judgment" ("DOE Memorandum") at 3, footnote 1. (Had DOE not abandoned this basis for justifying denial of reconsideration, plaintiff would have moved that DOE be barred from asserting lack of timeliness as the appropriate sanction for DOE's failure to comply with this Court's Order of November 2, 2005 granting in part plaintiff's Motion to Compel Discovery; the discovery ordered was requested so that plaintiff could demonstrate the lack of merit of OHA's finding of untimeliness.

STATEMENT OF FACTS

Because the issue for determination is the application of the terms of the Assignment and Assumption Agreement ("A & A Agreement") of April 29, 1983 between National Steel Corporation ("National Steel") and Weirton Steel Corporation ("Weirton Steel") to refunds of overcharges occurring during the 1973-1981 period of the price regulations of crude oil and petroleum products, it is appropriate first to summarize the regulatory system and the refunds available as a result of violation of the price regulations. After doing so, the facts will be set forth with regard to the contract language which must be interpreted as it applies to crude oil refunds.

THE REGULATION OF PETROLEUM AND THE PROVISIONS FOR REFUNDS

The prices charged by producers and resellers of crude oil, and the prices of products refined from that crude oil charged by refiners, resellers and retailers were regulated by the Department of Energy (and its predecessor agencies) during the August 1973 through January 1981 period. (Price regulation of crude oil extended through the entire period, while the length of time during that period in which the price of various petroleum products, e.g. gasoline, home heating fuel, airplane fuel etc. was limited by regulation varied).

The price regulation was pursuant to authority granted by

7

Section 209 of the  Economic Stabilization Act Amendments of 1971, ("ESA"), Pub. L. 92-210,85 Stat. 743 (1971) as incorporated in the Emergency Petroleum and Allocation Act ("EPAA"), Pub. L. 93-259, 87 Stat. 627 (1973).

ESA Section 209 authorized the United States to enforce the price regulations through judicial proceedings (later extended to provide for enforcement in administrative proceedings), and to recover overcharges for "restitution."

Prior to deregulation (in January 1981 as to crude oil, and earlier as to some of the petroleum products), overcharges were effectuated by reductions in the price which the regulatory violator was permitted to charge.

Upon deregulation, such was no longer possible.

The question of how to make "restitution" was fairly easily resolved in the case of refined products. Upon recovery by the DOE of overcharges, DOE sought to identify the customers who had purchased the product as to which the overcharges (by the refiner, reseller or retailer) occurred and provided a claims process pursuant to which such customers could claim an appropriate share of the recovered funds (in general, the amount per gallon each was entitled to was calculated by dividing the recovered funds by the volume of sales affected by the overcharge).

Making "restitution" after deregulation proved much more difficult for DOE as to crude oil overcharges ( overcharges by producers of crude oil or by resellers who purchased crude).

The difficulty occurred because under the regulatory system when a particular producer overcharged the refiner to which it sold its crude oil, the overcharge was spread to all refiners of the United States through a program called the Entitlements Program. The Entitlements Program was adopted to enable all refiners to have the advantage of lower price domestic oil to the same extent; in effect, refiners with a lower average cost of crude oil because of a higher percentage of that crude being purchased from domestic price-regulated producers were required to subsidize refiners with a higher average acquisition cost because of a higher percentage of their crude being purchased from unregulated foreign producers. The result of the Entitlements Program was that all refiners had essentially the same per barrel crude oil acquisition cost, and any overcharge to one refiner by a producer was effectively shared pro rata by all domestic refiners.

DOE faced multiple demands for "restitution" of crude oil refunds which DOE had recovered and was seeking to recover:

1. The Refiners of the United States who paid the

9

overcharge in the first place, and shared the overcharge pro rata through the Entitlements Program, asserted that they were entitled to the refunds because they had paid the overcharges and had not been able to pass the overcharges along to those downstream, i.e. resellers, retailers and end users;

2. The resellers and retailers asserted that the Refiners had in fact increased their prices to cover the overcharges and that as resellers and/or retailers they had been unable to pass along the overcharges by increasing their prices, and were therefore entitled to the refunds recovered by DOE;

3. The end users of petroleum products e.g. airlines, utilities, manufacturers, asserted that in fact the refiners, resellers and retailers had passed long the overcharges in higher prices, and that they, the end users, had been unable to pass along the increased price resulting from overcharges in the price of the products they made and sold, and that they were therefore entitled to the refunds;

4. Both the States of the United States and the federal government asserted their right to all the crude oil refunds (the States to the exclusion of the federal government, and the federal government to the exclusion of the States) in their capacity as <u>parens patriae</u> on behalf of their citizens, arguing that such would best effectuate "restitution."

The battle waged for five years, from 1981 through 1986.

During that period, there was no procedure provided for any of the claimants to seek recovery of the crude oil refunds which the DOE was in the process of recovering.

The DOE (in the provisions of settlements with some of the alleged overchargers),the Courts (in some of the cases in which DOE recovered from producers), and Congress (by legislative appropriation) provided for the use of some of the crude oil refunds which the DOE had recovered for various federal government purposes-- by distributing some of the recovered crude oil funds to the States to fund a federal program providing assistance for home heating to persons with low incomes (see e.g. United States v. Exxon, 773 F. 2d 1240 (TECA 1985), Warner Amendment, Pub. L. No. 93-377 Sec. 155, 96 Stat. 1830 (1982)), by distributing some of the funds to the U. S. Treasury for appropriation by the federal government (See, e.g. Payne 22 Inc. V. United States, 762F. 2d 81 (TECA 1985), Cities Service Co. V. DOE, 715 F. 2d 572 (TECA 1983)), and directing the use of some of the funds to purchase oil for the Strategic Petroleum Oil Reserve. However, a substantial portion of the recovered funds were held by DOE pending determination as to their distribution (See, e.g. Ashland Oil Inc. V. DOE, 760 F. 2d 298 (TECA 1985), Alkek/Adams, 9 DOE

11

(CCH) par. 82,553 (1982)).

When, during that period, end users of petroleum products sought to preclude diversion of the funds for federal programs and to claim from the funds, they were rebuffed. See discussion below).

DOE continued to resist adopting any claims program. Indeed, in July, 1985, in a formal policy statement, the DOE confirmed its past determination to reject the claims of others and advised that as parens patriae it would retain the recovered crude oil refunds in its control for use by the federal government. (Statement of Restitutionary Policy, 7 Energy Mgmt. (CCH) par. 90,508, 50  Fed. Reg. 27,400, July 2, 1985).

It was not until August 1986, in a settlement approved by the Court in In re The Department of Energy Stripper Well Exemption Litigation ("Stripper Well"), 653 F. Supp. 108 (D. Kan. 1986), that the DOE agreed:

(I) to allocate a portion of the crude oil refunds in the Stripper Well Court's control to the Refiners, resellers, retailers, the States (for use in energy programs approved by the DOE), and end user claimants electing to participate in that proceeding, and to retain for the U.S. Treasury only a part of the funds.

12

(ii)  as to crude oil refunds in its control, DOE agreed for the first time to adopt a program which permitted end user claimants, such as steel manufacturers, to make claims for the crude oil refunds which the DOE had recovered and would recover. For that purpose, DOE created a reserve of 20% of the crude oil refunds it had recovered, dividing the other 80% equally between the States and the U.S. Treasury.

Thus, as it relates to the instant matter, it was not until the execution of the <u>Stripper Well</u> Settlement Agreement and the issuance, as required by that Settlement Agreement, of a Statement of Modified Restitutionary Policy, 51 Fed. Reg. 27,899 (1986), 7 Energy Mgmt. (CCH) par. 90,508 A, that manufacturers such as steel plant operators obtained the right to make a claim for crude oil refunds on the basis of refined petroleum products purchased for manufacturing use during the 1973-1981 regulatory period. (Because manufacturers were not parties in <u>Stripper Well</u>, they were not eligible to recover from the crude oil refunds in that Court's control.)

When such a right to claim the crude oil refunds which the DOE had recovered, and was continuing in enforcement actions to recover, was created, the end user claimants were required only to demonstrate that they had purchased refined product during the period of regulation of crude oil, and the

13

volume of purchases; the identity of the refiner or reseller from which the petroleum product had been purchased was of no consequence because of a DOE determination that an overcharge by one refiner affected all refiners equally.

Another provision of the ESA, Section 210, provided for a private cause of action by one asserting that he had been overcharged, an action which could be brought only against the vendor who had sold the product to the plaintiff. In the case of an end user such as a steel manufacturer whose purchases were necessarily of refined petroleum products, not crude oil, ESA Section 210 provided no way of leaping over a vendor and seeking refunds from a crude producer.

THE PROVISIONS OF THE A & A AGREEMENT ARGUABLY RELEVANT TO REFUNDS OF REFINED PRODUCT AND CRUDE OIL OVERCHARGES

Plaintiff ISG and OHA (for DOE) are in agreement that there are only two provisions of the A & A Agreement between National Steel and Weirton Steel which are arguably relevant to overcharges in refined petroleum products (overcharges by refiners, resellers or retailers) and crude oil overcharges (overcharges by producers or resellers of crude oil):

1. Section 3.1 provides for an allocation as between National Steel Corporation and Weirton Steel Corporation of any "rebate, refund or reduction in rates from The Columbia

14

Gas System, Inc ("Columbia Gas"), Consolidated Rail
Corporation or any other Person." It provides that National
Steel may "retain for its own account any payments received
from Columbia Gas, Conrail or any other Person representing
overcharges or refunds prior to the Purchase Date."
(Administrative Record ("AR") at 319-320).

2. Section 7.2 allocates to National Steel "any recovery
from, all Proceedings which are not Pending Proceedings, to
the extent such Proceedings involve claims based on facts
occurring or existing prior to the Purchase Date." (A.R. at
328)

Section 7.4 allocates to Weirton Steel "any recovery
from, all Proceedings to the extent such Proceedings involve
claims based on facts occurring on or after the Purchase
Date." (A.R. at 329).

(In the relevant Glossary, "Proceedings" are defined as
including "any claim of the (Weirton) Division against any
person... or request for relief which may be brought in any...
administrative agency", and "person" is defined as including
"a government or any agency or political subdivision
thereof."). (A.R. 341-342).

As OHA notes correctly in its Decision (A.R. 394-395),
the "Pending Proceedings" (A.R. 384-391) did not include any

15

claim for crude oil refunds. (As noted above, there could not have been any Proceedings in the 1983-1984 time period to claim crude oil refunds which DOE had recovered, because DOE did not recognize any such right on the part of end users.)

<u>THE HISTORY OF THE APPLICATION FOR CRUDE OIL REFUNDS ON THE</u>
<u>BASIS OF REFINED PRODUCTS PURCHASED AT THE WEIRTON STEEL PLANT</u>

On June 2, 1989, "National Steel Corporation Weirton Steel Division" filed with OHA an application for crude oil refunds based upon purchase of 609,873,867 gallons of No. 6 residual fuel oil (A.R. 2-3). It was docketed as RF 272-75497, and captioned by OHA as "National Steel Corp./Weirton. Shortly thereafter, in July, 1989, applications were filed for purchases at two other National Steel Corporation facilities, National Steel Corporation-Midwest Steel Division, and National Steel Corporation, Great Lakes Steel Division (A.R. 4-9). Two years previously, in July, 1987 an application was filed by National Steel Corporation for its Granite City operations.

By Decision and Order issued March 1, 1991, OHA denied all four applications filed by National Steel Corporation. (A.R. 271-275). It did so on the basis of a Waiver and Release executed by the Permian Corporation ("Permian") September 12, 1986 in connection with a recovery by Permian of funds from

16

the Surface Transporters Escrow created from funds in the Court's control pursuant to the Settlement Agreement in In re The Department of Energy Stripper Well Exemption Litigation, 653 F. Supp. 108 (D. Kan. 1986). OHA interpreted the Waiver and Release as barring recovery of crude oil refunds in the DOE crude oil refund proceedings by any affiliate of Permian. It found that National Steel Corporation was such an "affiliate" of Permian because (I) "National Intergroup, Inc. (NII) had owned 50 percent of National Steel Corporation since 1984, and (ii) "in 1985, NII acquired the Permian Corporation."

In denying the application of National Steel Corporation for crude oil refunds based on purchases for the Weirton facility, OHA was unaware that National Steel Corporation was not itself a principal entitled to the crude oil refunds on the basis of the Weirton facility purchases, but was merely acting as an agent for the Weirton Steel Corporation which was entitled to such refunds pursuant to the A & A Agreement. Presumably, National Steel Corporation was equally unaware that it was acting as an agent, believing it to be entitled to the refunds for Weirton purchases because it had operated the facility at the time the purchases were made; evidently, it was not sufficiently familiar with the history of the crude

17

oil refund program to understand that the critical "fact" which was requisite for recovery of crude oil refunds-- the creation of a claimant's right to crude oil refunds-- did not occur until more than two years after its sale of the Weirton Steel assets to the Weirton Steel Corporation, and therefore, it was the Weirton Steel Corporation, not National Steel Corporation, which was entitled to the crude oil refunds on the basis of the Weirton purchases of refined petroleum product.

The Weirton Steel Corporation was not an affiliate of Permian when Permian executed the Waiver and Release, and accordingly, it was not barred as a crude oil refund claimant by virtue of the Permian release.

Weirton Steel Corporation was evidently equally unaware that it, not National Steel Corporation, was entitled to crude oil refunds based on purchases for the Weirton facility, presumably for the same reason, i.e. its unfamiliarity with the history of the creation of the right to crude oil refunds. Presumably for that reason, it did not itself assert a claim for crude oil refunds, nor did it seek reconsideration of the denial of refunds to National Steel for the Weirton purchases.

By an Amended and Restated Asset Purchase Agreement, dated February 25, 2004, Weirton Steel Corporation sold to

International Steel Group Inc. ("ISG") "All of the properties,
assets and rights of Sellers (Weirton Steel Corporation),
wherever located, whether real or personal, tangible or
intangible, existing or hereafter acquired and whether or not
reflected on the books or financial statements of Sellers,
excluding only the Excluded Assets, including without
limitation...

"(m) except as provided in Section 1.2 ©) and Section 1.2
(d) all Claims of Sellers."

The specific exclusions do not include the right to
crude oil refund claims; hence, the right to crude oil claims
was conveyed to ISG.

Later in the same year of its acquisition of the crude
oil refund rights of Weirton Steel Corporation, and upon
having it called to ISG's attention that it had the right to
assert Weirton Steel Corporation's crude oil refund rights,
ISG moved for reconsideration by OHA of its prior denial of
the application of National Steel Corporation/Weirton. It did
so on the basis that, as a matter of law, National Steel
Corporation had been acting as an agent, not as a principal in
seeking refunds for its purchases at Weirton because it was
Weirton Steel Corporation, not National Steel Corporation,

19

which had the right to claim crude oil refunds for the Weirton
operations, and therefore, OHA  improperly denied the claim of
National Steel Corporation/Weirton on the basis of Permian's
execution of a waiver. The Motion for Reconsideration sought
the award of crude oil refunds to ISG for the purchases of
refined petroleum product at Weirton for which application had
been made by National Steel Corporation.( A.R. 286-309)

By Decision and Order issued June 1, 2005, OHA denied
the ISG Motion for Reconsideration, doing so on two bases: (I)
the Motion for Reconsideration was "filed too late,", and (ii)
pursuant to the Assignment and Assumption Agreement between
National Steel Corporation and Weirton Steel Corporation, the
right to claim crude oil refunds belonged to National Steel
Corporation and not to Weirton Steel Corporation, and
accordingly was not conveyed to ISG by Weirton Steel
Corporation. A.R. 392-395)

<u>ARGUMENT</u>

As OHA's Decision and DOE's Memorandum both acknowledge,
the merits of ISG's assertion that it is entitled to crude oil
refunds as successor to Weirton Steel turns on the
interpretation of two sections of the A & A Agreement pursuant
to which Weirton Steel in 1983 acquired from National Steel

20

the steel manufacturing facilities at Weirton, W. Virginia, i.e. Section 3.1 and Sections 7.2 and 7.4 of the A & A Agreement.

If ISG is correct (I) that Section 3.1 is inapplicable, and (ii) that, under Sections 7.2 and 7.4, the right to crude oil refunds for purchases at the Weirton plant was a right belonging to Weirton Steel, then ISG as Weirton Steel's successor is entitled to crude oil refunds for the purchases at the Weirton plant.

Accordingly, ISG will first address the issue of the standard which the Court must adopt in such review, demonstrating that it is a de novo interpretation by the Court, and will then turn to the language at issue.

I    THE COURT'S INTERPRETATION OF THE AGREEMENT BETWEEN NATIONAL STEEL AND WEIRTON STEEL TO DETERMINE WHETHER NATIONAL STEEL WAS THE OWNER OF THE RIGHT TO CRUDE OIL REFUNDS OR MERELY AN AGENT FOR WEIRTON STEEL IS DE NOVO; NO DEFERENCE IS DUE TO OHA OR DOE

Where the issue is, as here, interpretation of contract language, the Court's review is de novo, with no deference due to any administrative agency which may have interpreted the contract language. Such is the case even when the contract is

21

one which deals with funds being distributed by the administrative agency, and indeed even when the term of the contract being interpreted requires reference to the regulations of the administrative agency.

In reviewing the agency's interpretation, no deference is due the agency. <u>Consolidated Edison Co. V. Richardson</u>, 232 F. 3d 1380, 1383. In that case, the issue was the interpretation of a term in the <u>Stripper Well</u> Settlement Agreement, "alleged crude oil violations,", an interpretation which required construing the DOE's regulations as to what is a "crude oil violation." The District Court had adopted a "deferential standard of review," i.e. it had deferred to OHA's interpretation.

The Court of Appeals for the Federal Circuit held that "Con Ed is correct that interpretation of the Stripper Well Agreement is a matter of law and therefore reviewed de novo... the district court applied an incorrect standard of review." The Court (I) explained that it had adopted as precedent the decisions of its predecessor, the Temporary Emergency Court of Appeals ("TECA"), (ii) noted that "The TECA has previously held that interpretation of the Stripper Well Agreement is a question of contract interpretation and is reviewed de novo, <u>See</u> <u>Mid-America</u>

22

Dairymen Inc. V. Herrington, 878 F. 2d 1448, 1450, note 1 (TECA 1989), In re Dep't of Energy Stripper Well Litigation, 855 F. 2d 865, 868 (TECA 1988)" and (iii) concluded that "we are bound by our precedent."

DOE's Memorandum relies heavily on case law which recognizes a deferential standard of review. Such is the case when OHA is determining whether its regulations have been violated or even when the issue is whether a claimant has provided sufficient proof that its purchases of refined product qualify it for refunds. In such cases, DOE correctly points out, OHA is entitled to "great deference", and the Court "must approve the DOE decision if there is a rational basis for it," Phoenix Petroleum Co. V. Federal Energy Regulatory Comm'n, 95 F. 3d 1555, 1567 (Fed. Cir, 1996) (DOE Memorandum at 13-14)

But DOE is clearly wrong when it asserts that standard is applicable here and that OHA's interpretation of the contract language must be adopted by the Court provided only that there is "substantial" evidence in support of that interpretation and that the interpretation is "rational." (DOE Memorandum, at 14-17. The issue here is not, as DOE suggests it is, interpretation of DOE's own policy statements (DOE Memorandum at 16), but rather interpretation of a contract.

23

Such an interpretation is clearly a matter for the Court on a de novo basis, with no deference due to OHA.

II   THE APPLICABLE PROVISIONS OF THE A & A AGREEMENT ARE 7.2 AND 7.4, NOT 3.1, AND UNDER SECTIONS 7.2 AND 7.4, THE RIGHT TO CRUDE OIL REFUND CLAIMS IS IN WEIRTON STEEL, NOT NATIONAL STEEL

As OHA correctly recognized, the instant situation is either covered by Section 3.1 of the A & A Agreement, or by Sections 7.2 and 7.4.

OHA was incorrect in finding Section 3.1 to be the applicable provision.

And, when OHA in its Decision turned to an interpretation of Sections 7.2 and 7.4 as possible alternative applicable provisions, it erred in interpreting those Sections. Because the central essential "fact" for recovery of crude oil refunds, i.e. the existence of a right in end users to claim such, had not occurred, and did not exist, as of the sale of the Weirton facility to Weirton Steel, the right to crude oil refunds was in Weirton Steel, not National Steel.

A. Section 3.1 Is Relevant Only To Recoveries In A Private Cause of Action Under ESA Section 210; It Has No Applicability Here Where the Recovery Is A Proceeding Claiming Funds Recovered By DOE

24

Pursuant To ESA Section 209

Section 3.1 of the A & A Agreement provides an allocation as between National Steel and Weirton Steel of (I) "any rebate, refund or reduction in rates from The Columbia Gas System Inc. ("Columbia Gas"), Consolidated Rail Corporation ("Conrail" or any other Person based upon or attributable to overcharges to or refunds earned by the Division prior to the Purchase Date (defined elsewhere in the A & A Agreement as May 1, 1983).". It proceeds (ii) to provide that National Steel may "retain for its own account any payments received from Columbia Gas, Conrail or any other Person representing overcharges or refunds prior to the purchase date."

The OHA Decision here quotes only the latter provision, failing to recognize that the retention of payments "representing overcharges or refunds" relates to the subject matter of the provision, i.e. "any rebate, refund or reduction in rates."

The provision clearly provides only as to funds recovered from a vendor from whom National Steel had made purchases.

Thus, if any of the vendors from whom National Steel had purchased the 609 million gallons of No. 6 residual fuel oil during the 1973 to 1981 regulatory period (the basis of the crude oil refund claim) were to refund a portion of the purchase price as a "rebate, refund, or reduction," National Steel would be entitled to retain

25

such funds.

Similarly, had National Steel brought a private cause of action under ESA Section 210 against such vendors for overcharges, i.e. charges for the No. 6 fuel oil which were in excess of the amount permitted by the price regulations, and in such private action recovered a portion of the purchase price, National Steel would be entitled to retain such funds.

The crude oil refunds here involved, are not covered by Section 3.1 for two reasons:

1. Recoveries of overcharges-- whether in the pricing of refined products or crude oil-- by the DOE pursuant to ESA Section 209, a public action, can be obtained by the injured parties, i.e. the parties entitled to "restitution" under ESA Section 209, only in a claims "proceeding" permitted by DOE. The recovery by the injured parties, such as National Steel of Weirton Steel is not a recovery from a vendor, but from the United States, and therefore not covered by Section 3.1.

The inapplicability of Section 3.1 to recoveries from the DOE of alleged overcharges is clarified, if any clarification is needed, by the fact that there are provisions of the A & A Agreement, i.e. Sections 7.2 and 7.4, which do provide for a situation where the recovery is not from a vendor, but from a federal administrative

26

agency such as DOE which has recovered from vendors.

2. There were no overcharges in the pricing of crude oil which had been charged by a vendor to National Steel, both because (I) no crude oil was purchased for use in the Weirton steel manufacturing plant, only residual fuel oil refined from crude oil, and (ii) National Steel had purchased nothing from the producers and resellers of crude oil from whom DOE was recovering pursuant to ESA Section 209, and therefore could never have received a "rebate, refund or reduction in rates" from such crude oil producers and resellers.

Indeed, the crude oil refunds potentially available on the basis of purchases of fuel oil purchased for the Weirton plant were not even based on overcharges by a producer to the refiners who provided the No. 6 fuel oil to the Weirton plant. The overcharges affected the refiners from whom the No. 6 fuel oil was purchased only by virtue of the Entitlements Program. Thus, if producer A overcharged Refiner B, and the DOE made a recovery from producer A, such recovered funds would be distributed to National Steel or Weirton Steel on the basis of purchases which had been made from refiners C, D., and E, and even though no purchases had been made from refiner B.

27

B. <u>Sections 7.2 and 7.4 of the A & A Agreement Are Here</u>
<u>Relevant As To Crude Oil Refunds Recovered By The DOE and Distributed</u>
<u>To End User Claimants</u>

In contrast, Sections 7.2 and 7.4 with regard to "Proceedings" are appropriately construed to govern the instant situation, i.e. recovery from DOE of crude oil refunds which DOE had recovered in an ESA Section 209 public action,

"Proceedings" are defined in the relevant Glossary as including "any claim of the (Weirton) Division against any person... or request for relief which may be brought in any... administrative agency", and "person" is defined as including "a government or any agency or political subdivision thereof." (A.R. 341-342).

Here, National Steel made a "claim" in a proceeding before an "administrative agency", OHA, for "relief", i.e. a pro rata portion of the crude oil refunds which DOE had recovered from producers and resellers of crude oil pursuant to ESA Section 209 , and as to which DOE had an obligation to make "restitution" pursuant to ESA Section 209.

Accordingly Sections 7.2 and 7.4 which allocate the right to recoveries in such "Proceedings" as between National Steel and Weirton Steel are the relevant provisions to the issue here, i.e. whether it is National Steel or Weirton Steel which is entitled to

28

crude oil refunds, and whether therefore when National Steel made timely application for crude oil refunds, it was acting as the principal or merely as an agent for Weirton Steel.

If acting as a principal, National Steel was properly disqualified because of a waiver executed by an affiliate. If it was acting as an agent for Weirton Steel, National Steel was not properly disqualified because its principal, Weirton Steel, was not affiliated with the party executing the waiver, and the reconsideration which Weirton Steel's successor in interest, ISG, her sought should be granted and a crude oil refund made to ISG.

We now turn to the critical issue for de novo determination  by this Court, i.e. the interpretation of Sections 7.2 and 7.4.


C. <u>One of The Three Critical Facts Upon Which the Claim For Crude Oil Refunds From the DOE Is Based-- That There Be a Right To Claim Such Funds- Did Not Occur or Exist Until After the Purchase Date</u>

Section 7.2 provides that the Seller, National Steel, is to "retain any recovery from (,) all Proceedings which are not Pending Proceedings, to the extent such Proceedings involve claims based on facts occurring or existing prior to the Purchase Date." (A.R. 327)

The companion provision, Section 7.4 provides that the Buyer,

Weirton Steel, is to "retain any recovery from all Proceedings to the extent such Proceedings involve claims based on facts occurring on or after the Purchase Date." (A.R. 329)

(The "Purchase Date" is defined in the Glossary as "May 1, 1983". A.R. 375).

The "Proceeding" here involved-- a "Proceeding" in which crude oil refunds recovered by the DOE are claimed by an end user purchaser affected by crude oil overcharges passed through in the price of refined products-- was not a "Pending Proceeding" (the Pending Proceedings are listed at A.R. 384-391).

Indeed-- and this is the critical point-- there could have been no pending proceedings because no such proceedings were possible as of May 1,1983, nor in the balance of 1983, 1984, and 1985, and indeed not until after the execution of the <u>Stripper Well</u> Settlement Agreement in August 1986, and the adoption of a program by DOE implementing the claims procedure it had undertaken in the <u>Stripper Well</u> Settlement Agreement. Although until then, DOE was recovering crude oil refunds by litigation and settlements, it had provided no procedure for any claimant to assert the right to such funds.

Indeed, until 1986, the DOE actively, and successfully, resisted any and all attempts by potential end user claimants to require it to adopt a proceeding in which claims could be made to

30

crude oil refunds.

In United States v. Exxon Corp., 773 F. 2d 1240 (TECA 1985), consumers, some represented by the attorney for ISG here, challenged a District Court determination to distribute crude oil refunds recovered in that litigation to the States of the United States for implementation of a federally created low income home energy assistance program. The consumers (and indeed the defendant Exxon, too) asserted that the Court should have provided the funds, or part of them, to the consumers as injured parties, and suggested referral to OHA so that they could assert their claims. The DOE successfully resisted that effort, insisting that no such claim right should be provided to those asserting injury.

The Court in Exxon distinguished its prior holding in Citronelle-Mobile Gathering Inc. v. O'Leary, 669 F. 2d 717 (TECA 1982) in which it had remanded a determination by the District Court to award crude oil overcharges to the U.S. Treasury "for the purpose of fashioning some plan for disbursement of restitution funds, in accordance with the requirement that the Government must at least try to ascertain those persons who had been overcharged." As the Exxon Court explained, the Citronelle situation was a unique one because the overcharges had "All occurred prior to implementation of the Entitlements Program," and it was therefore possible to trace the

31

overcharges through a specific refiner to the claiming end users. 773 F. 2d at 1284. In contrast, the crude oil refunds being allocated in Exxon and those now being distributed by DOE are essentially all as a result of overcharges occurring after the adoption of the Entitlements Program. And it was as to such overcharges that the Exxon Court rejected any program for distribution to claimants.

On another front, after an extended series of hearings in 1984 addressing the issue of whether it could be determined at which level of distribution crude oil overcharges were absorbed, held by OHA at the instance of the Stripper Well Court, DOE adopted a policy statement that it would make the recovered crude oil funds it had recovered and was still holding available for Congressional appropriation, and in the absence of Congressional action, would distribute the funds to the U.S. Treasury. (Statement of Restitutionary Policy, 7 Energy Mgmt. (CCH) par. 90,508, 50 Fed. Reg. 27,400, July 2, 1985).

In sum, in 1983 not only was there no available proceeding in which claims for crude oil refunds could be made, but there was a clear and repeated determination by DOE that no such claims proceedings would be made available by it. Moreover, neither the Courts nor Congress were available to direct otherwise. The Courts, as in Exxon, had sustained DOE's objection to any claims process for

32

crude oil refunds, and Congress had itself appropriated $200 million of the crude oil refunds. <u>Warner Amendment</u>, <u>supra</u>.

(The situation was markedly different as to refined product refunds, i.e. refunds recovered on the basis of alleged violations of the price regulations applicable to refined product. There, because there was no Entitlement Program, and little argument about absorption, a claims process was being provided for end users to claim refunds. (<u>Office of Special Counsel/Tenneco Oil Co.</u>, 9 DOE (CCH) par. 82, 538 (1982). The existence of such a "Proceeding" as to refined product claims is yet another demonstration that the decision of DOE not to provide such a "Proceeding" for crude oil refunds was deliberate and firm.)

In sum, there was not only no Pending Proceeding in which National Steel was claiming crude oil refunds, but there was no possibility of such a Proceeding.

As a result, there can be no question that in selling its steel manufacturing facility at Weirton to Weirton Steel, National Steel had no possible expectation of obtaining any of the crude oil refunds being recovered by DOE.

It is in that light that the language of Sections 7.2 and 7.4 must be interpreted. The issue is what were the "facts" upon the basis of which a claim could be made for crude oil refunds. For if

33

those "facts" all had occurred or existed prior to May 1, 1983, the "purchase date", then it was National Steel which was entitled to claim crude oil refunds, while if those "facts" had not all occurred by May 1, 1983, the right to crude oil refunds belonged to Weirton Steel, the buyer.

In all claims procedures, whether they be in an administrative or judicial setting, three "facts" are essential for a claim to be made: (I) the claimant must be able to demonstrate the injury for which he seeks a remedy, (ii) there must be funds or assets which can be used to satisfy a claim, and, (iii) most importantly, there must be a recognized right to make a claim. In jurisdictional terms, the second of these two is an issue of standing, i.e. whether the claim holds promise of the possibility of relief, while the third is an issue of whether a cause of action exists, i.e. whether there is recognized theory upon the basis of which a claim may be made.

If there is no recognized right to relief, then one of the three "facts" which must occur or exist for the making of a claim has not occurred and does not exist.

And if there are limited funds available to satisfy the claim, then the "facts" which may be the basis of a claim exist only to the extent of such funds.

As to the specific subject matter here, the crude oil refunds

34

in the hands of the DOE as a result of its enforcement actions, three "facts" all must occur in order for there to be a "recovery" by an end user manufacturer in "Proceedings" which "involve claims", i.e.:

(I) The claimant, or its predecessor, must have purchased the refined petroleum products on the basis of which the claim is made during the relevant period, i.e. August, 1973 through January, 1981 ;

(ii) DOE must have recovered the refunds which are sought in the "Proceedings";

(iii) The right to claim crude oil refunds must exist.

This third "fact," i.e. the existence of a right to claim crude oil refunds, was not a "fact" as of either the Purchase Date (May 1, 1983) or the closing date (January 1984) of the National Steel-Weirton Steel transaction.

It became a "fact" only with the creation of the right to claim in the latter part of 1986.

Accordingly, the claim for crude oil refunds here was "based on facts occurring... after the Purchase Date," and the right to "recovery" from "Proceedings" involving such a claim was a right belonging to the Buyer, Weirton Steel Corporation.

D. <u>In Any Event, The Limitation of National Steel's Right to the "Facts" Occurring or In Existence As of May 1, 1983 Would Limit</u>

35

Its Rights To A Small Portion of the Crude Oil Refunds Which Are

Being Distributed; The Balance Belonged to Weirton Steel, And

Therefore To Its Successor In Interest, ISG

As to the third "fact" necessary for recovery of crude oil refunds, i.e. that the funds to be claimed had been recovered by DOE and therefore were "in existence", such "fact" existed as of May 1, 1983 as to some of the crude oil refunds, i.e. those already recovered, but not as to others, i.e. funds which were not recovered until much later in time, as enforcement proceedings resulted in judgments or settlements.

Accordingly, were the Court to find that the existence of a cause of action, i.e. the right to claim refunds recovered by DOE, was not a "fact" required to have come into existence prior to May 1, 1983, it would then be required to address the "facts" with regard to the amount of refunds which were in existence as of May 1, 1983.

National Steel would be entitled only to its share of the crude refunds recovered by DOE as of May 1, 1983. The balance of the crude refunds would belong to Weirton Steel because they became a "fact" only after May 1, 1983. An allocation would accordingly be required as between the seller, National Steel Corporation, and the buyer, Weirton Steel Corporation on the basis of the date of recovery of the funds by DOE.

36

Should this "fact", i.e. the amount of refunds recovered by DOE as of May 1, 1983 become the critical one, summary judgment would not be appropriate; an investigation and fact finding would be required as to the amount of refunds recovered by DOE prior to May 1, 1983.

Reconsideration would then be properly ordered as to the refunds recovered by DOE after the May 1, 1983 date.

(For the Court's information, as late as February, 1988, almost five years after the May 1, 1983 Purchase Date, the amount of refunds recovered by DOE would have provided refunds of slightly in excess of $300 per million gallons of petroleum product purchased by the claimant. See Ernest E. Allerkamp, 17 DOE (CCH) par. 85,079 (1988). Such is a small part of the almost $2300 per million gallons being distributed to claimants in the DOE crude oil refund proceedings. ISG hastens to note that there would be complicated issues, particularly issues as to interest, which would be involved in any allocation. However, it is clear that the most substantial part of the crude oil refunds being distributed to claimants were recovered, i.e. became a "fact", after the Purchase Date, and therefore reconsideration of the denial of crude oil refunds for the benefit of ISG as Weirton Steel's successor in interest would be appropriate to a greater portion of the crude oil refunds.)

III    ISG IS ENTITLED AS SUCCESSOR TO WEIRTON STEEL TO SEEK
RECONSIDERATION OF THE DENIAL OF CRUDE OIL REFUNDS TO NATIONAL STEEL;
THE WAIVER BY NATIONAL STEEL'S AFFILIATE DOES NOT PRECLUDE A RECOVERY
BY ISG AS WEIRTON STEEL'S SUCCESSOR

The OHA Decision denying ISG's Motion for Reconsideration of
OHA's prior denial of National Steel's application for crude oil
refunds does not question ISG's assertion that (I) if the right to
crude oil refunds properly belonged to Weirton Steel, (ii) National
Steel is properly deemed to have made the application as Weirton
Steel's agent, (iii) the Waiver executed by National Steel's
affiliate which was the basis of the denial of its application does
not preclude recovery by National Steel as agent for Weirton Steel,
and (iv) ISG as successor to Weirton Steel may properly seek
reconsideration of the denial of crude oil refunds for purchases at
the Weirton facility.

Before reviewing briefly the bases for the assertions (ii)
through (iv), it is appropriate to note that the central principle of
the formula utilized by DOE in awarding crude oil refunds was the
allocation of a share of the recovered funds for every gallon of end
use of refined petroleum product during the crude oil regulatory
period, August 1973 through January, 1981.  Such was implemented by
calculating the per gallon entitlement of each claimant by dividing

38

the recovered refunds by the 2 trillion gallons of refined petroleum product purchased during the crude oil regulatory period.

Accordingly, crude oil refunds were allocated to the 609 million gallons representing the purchases of fuel oil for use at the Weirton Steel facility. No one other than National Steel as agent for Weirton Steel, Weirton Steel itself, or ISG as Weirton Steel's successor in interest, has claimed or could claim refunds on the basis of such 609 million gallons.

It is correct that because the 20% which has been reserved for crude oil refunds to claimants is not adequate to fund the formula for all claimants, the funds allocable to the Weirton claim, approximately $1.4 million, will, if not so used, possibly be distributed to the other 31,000 claimants. (In fact, although OHA has reserved $1.4 million for the Weirton claim, it has made no commitment to distribute any part of that $1.4 million not in fact awarded to ISG pursuant to the instant litigation; accordingly, if the award is not made to ISG, the funds allocated for that purpose may not go to claimants, but may be retained by the U.S. Treasury or possibly divided between the U.S. Treasury and the States of the United States).

(ii) <u>National Steel is properly deemed to have made the application as Weirton Steel's agent</u>

An application for refunds for the purchases at the Weirton steel facility was timely made by National Steel, and supported by the required proof.

If ISG is held to be correct in its contention that it was Weirton Steel which was the owner of the claim, then National Steel must necessarily have been acting as an agent for Weirton Steel. OHA has not argued, and it would clearly be inequitable for it to argue, that the mutual mistake of OHA, National Steel, and Weirton Steel in not recognizing that National Steel was acting as agent should preclude the recovery of funds which have been allocated by DOE formula for the 609 million gallons of fuel purchased for the Weirton Steel facility.

As to National Steel and Weirton Steel, the mistake is understandable; there was no reason to expect that they would be familiar with the fact that until 1986 DOE had not created, indeed had denied, any right on the part of end user claimants to recover crude oil refunds it had obtained pursuant to ESA Section 209.

OHA, of course, did know that the critical fact of the existence of a crude oil refund program did not exist until late 1986. Had OHA been aware of the sale of the Weirton facility more than three years

40

earlier, and necessarily have asked for the documents memorializing that sale, it would have uncovered the fact that Weirton Steel was the owner of the claim and would have treated National Steel as its agent. As noted next, it would not have denied the award on the basis of the Permian waiver, and would have awarded crude oil refunds to Weirton Steel, or perhaps to National Steel as its agent with a direction that National Steel pay the refunds over to Weirton Steel.

Such would be consistent with OHA's handling of crude oil refunds in similar situations: electric utilities and farmer cooperatives are permitted to be awarded and collect crude oil refunds as agents of the utility customers and the farmer cooperative member farmers, with a direction to pass the refunds through to their customers and members.


(iii) <u>the Waiver executed by National Steel's affiliate which was the basis of the denial of its application does not preclude recovery by National Steel as agent for Weirton Steel</u>

More than three years after the sale of the Weirton facility to Weirton Steel, the Permian Corporation, which had become an affiliate of National Steel two years after the sale to Weirton Steel, applied for and received funds in the control of the <u>Stripper Well</u> Court.

In so claiming <u>Stripper Well</u> funds for its trucking operations,

41

Permian executed a Waiver which has been construed as waiving not only its own right to recover crude oil refunds in the DOE crude oil refund proceedings, but also the rights of any affiliate to recover on the basis of that affiliate's own purchases.

The Waiver did not purport to, and has never been held to, surrender the right of an unrelated principal, such as Weirton Steel, i.e. principal with no ownership affiliation with the party executing the <u>Stripper Well</u> waiver. There is nothing in the waiver which precludes a claim by an affiliate, where as here, the affiliate, National Steel, is acting not for itself but only as an agent for the unaffiliated owner of the crude oil refund claim.


(iv) <u>ISG as successor to Weirton Steel may properly seek reconsideration of the denial of crude oil refunds for purchases at the Weirton facility</u>

As the principal for whom National Steel was acting in applying for crude oil refunds, Weirton Steel had the right to seek reconsideration of the rejection of what had in actuality been its own claim.

ISG succeeded to that right when the assets of Weirton Steel were sold to ISG in 2005.

By an Amended and Restated Asset Purchase Agreement, dated

42

February 25, 2004, Weirton Steel Corporation sold to International Steel Group Inc. ("ISG") "All of the properties, assets and rights of Sellers (Weirton Steel Corporation), wherever located, whether real of personal, tangible or intangible, existing or hereafter acquired and whether or not reflected on the books or financial statements of Sellers...",

An examination of that Agreement leads to the inevitable conclusion that it transferred to ISG any and all rights to crude oil refund claims which Weirton had. (See pages 18-19 above).

ISG, within a year after acquiring Weirton Steel's right to seek reconsideration of the denial to it of crude oil refunds exercised that right.

CONCLUSION

For the reasons above set forth this Court is respectfully requested to

(I) reverse the denial by OHA of ISG's Motion for Reconsideration seeking crude oil refunds for the purchase of refined petroleum products by National Steel Corporation at the Weirton, W. Va. Steel manufacturing facility now owned by ISG, and for whose predecessor owner, the Weirton Steel Corporation, National Steel Corporation was acting as agent in asserting such claim;

43

(b) direct defendants in their official capacities with OHA and DOE to award to ISG crude oil refunds for such purchases to the same extent as all other claimants who have already received crude oil refunds and to whom additional crude oil refunds are being distributed.

The opportunity to offer oral argument in support of this motion is respectfully requested.

Respectfully submitted,

_____

Philip P. Kalodner
208 Righters Mill Road
Gladwyne PA 19035
DC Bar 973578

February 16, 2006          Attorney for Plaintiff