IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
                                        )
MITTAL STEEL USA ISG, INC.,             )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )        CIVIL ACTION NO. 1:05CV01466ESH
                                        )
SAMUEL BODMAN, Secretary of             )
Energy, United States; GEORGE           )
BREZNAY, Director, Office of            )
Hearings and Appeals, U.S.              )
Department of Energy,                   )
                                        )
            Defendants.                 )
_____ )

FEDERAL DEFENDANTS' REPLY IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND STATEMENT
IN FURTHER SUPPORT OF FEDERAL DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>

## I.  <u>INTRODUCTION</u>

Defendants Samuel Bodman, Secretary of Energy, United States, and George B. Breznay,

Director, Office of Hearings and Appeals, U.S. Department of Energy ("DOE") (hereinafter

("Federal Defendants"), filed their Motion For Summary Judgment on January 20, 2006.

Plaintiff Mittal Steel USA ISG, Inc. ("Mittal") filed its cross Motion For Summary Judgment on

motion on February 16, 2006.  The Federal Defendants hereby file their Reply In Opposition To

Mittal's Motion For Summary And Statement In Further Support Of Federal Defendants' Motion

For Summary Judgment.

## II.  <u>STATEMENT</u>

A summary of the pertinent events leading to this litigation is necessary to place Mittal's

legal theory in perspective.

(1) During the period of August 1973 to January 1981, DOE and its predecessors in the Executive Branch administered allocation and price control regulations that covered crude oil and refined petroleum products. Federal Defendants' Memorandum In Support Of Their Motion For Summary Judgment ("Memo.") at 3-6.

(2) National Steel Corporation ("National Steel") operated a steel plant facility in Weirton, West Virginia during the period in which the allocation and price controls over crude oil and refined petroleum products were in effect. Certified Agency Record ("R.") 271.

(3) During the period in which the allocation and price control program for crude oil and refined petroleum products was in effect, National Steel purchased a refined petroleum product -- No. 6 residual fuel oil – for use at its Weirton plant. R 392.

(4) National Steel sold the assets of its Weirton plant to Weirton Steel Corporation ("Weirton Steel"), pursuant to an agreement reached in April 1983. R. 392.

(5) In 1986, the DOE's Office of Hearings and Appeals ("OHA") issued a policy statement that led to the establishment of procedures that firms could use to file claims against crude oil overcharge funds that DOE and its predecessors had collected from firms that had violated the pricing regulations in effect during the period of August 1973 to January 1981. Memo. at 6-9.

(6) National Steel submitted a number of applications to OHA in 1989 for refunds of overcharges National Steel believed it paid during the period of price controls for petroleum products that were purchased for use at some of its plants, including the Weirton facility. R. 271-74.

(7) OHA denied, in a 1991 decision, National Steel's applications based on the finding

that an affiliate had executed a waiver of its rights, and those of its affiliates such as National

Steel, to file an application with OHA for a refund. R. 272-74.

(8) Weirton Steel sold its assets to Mittal in February 2004, and then Mittal thereafter

submitted to OHA later that same year a motion for reconsideration of OHA's 1991 decision

denying National Steel's application for a refund for petroleum products purchased for the

Weirton facility during the period of price controls. Memo. at 11.

(9) OHA denied Mittal's motion for reconsideration, finding that Mittal had not obtained,

through its purchase from Weirton, the right to submit a refund claim for the products that

National Steel had purchased for its Weirton plant during the period of price controls. R. 393-

95.

The essence of Mittal's argument is (i) that National Steel did not have, prior to its sale in

1983 of its Weirton plant, the right to file a refund claim with OHA, (ii) that such right actually

belonged to Weirton Steel and (iii) that Mittal purchased that right from Weirton Steel in 2004.

Statement Of Points And Authorities In Support Of Plaintiff's Motion For Summary Judgment

And In Opposition To Defendants' Motion For Summary Judgment ("Pl. Memo.") at 2-3. Most

simply stated, Mittal has failed to show that National Steel did not have the right to the refund

claim based upon the refined petroleum products it purchased for use at the Weirton facility. As

the Federal Defendants have stated previously, Mittal's entire case rests on the premise that the

right it now claims as its own was transferred in 1983 by National Steel to Weirton Steel, which

thereafter transferred it to Mittal Steel in 2004. Pl. Memo. at 13.

III. THE FEDERAL DEFENDANTS' RESPONSE TO
     PLAINTIFF'S STATEMENT OF MATERIAL FACTS

The Federal Defendants dispute the following paragraphs of the Statement Of Material

Facts In Support Of Plaintiff's Motion For Summary Judgment ("Statement").

Paragraphs 4 through 15 of the Statement do not constitute, either individually or collectively, statements of material facts. Rather, they are primarily extensions or restatements of the discussion or argument contained in the Statement Of Points And Authorities In Support Of Plaintiff's Motion For Summary Judgment And In Opposition To Defendants' Motion For Summary Judgment ("Memorandum"). Some of these paragraphs may contain one or more "facts," but these "facts" consist primarily of citations to cases, or policies or regulations. As such, these paragraphs should not be viewed to contain "material facts" as to which there is no genuine issue and upon which Mittal may rest its contention that it is entitled to summary judgment as a matter of law. The Federal Defendants rely on their opening papers and this memorandum to dispute these paragraphs of Mittal's Statement.

Paragraphs 12, 18, 20, 22 and 23 also do not constitute, either individually or collectively, statements of material facts. These paragraphs primarily contain various legal arguments that Mittal also offers in its supporting memorandum and should not be treated as statements of material facts. While it also true that some of these paragraphs may contain one or more "facts," such "facts" consist primarily of citations to cases, or policies or regulations. As such, these paragraphs should not viewed to contain "material facts" as to which there is no genuine issue and upon which Mittal may rest its argument that it is entitled to summary judgment as a matter of law. The Federal Defendants rely on their opening memorandum and this memorandum to dispute these paragraphs of Mittal's Statement.

IV.  <u>ARGUMENT</u>

    A.    MITTAL'S ARGUMENT CONCERNING
           THE APPLICABLE STANDARD OF
           <u>REVIEW IN THIS CASE IS WITHOUT MERIT</u>

Mittal's argument that this case should be reviewed de novo, Pl. Memo. at 21-24, is without merit.  In this case, the agency was applying and interpreting its Modified Statement of Restitutionary Policy, Memo. at 3-6, as well as its policy concerning "an applicant's eligibility for a refund where changes of ownership are concerned." R. 393.

OHA's Modified Statement of Restitutionary Policy implemented the agreement DOE reached in another proceeding requiring the establishment of a mechanism that would permit victims of oil overcharges to submit claims for refunds.  Memo. at 5 - 9.  More specifically, the particular OHA  policy in this case concerned a situation where questions relating to "an applicant's eligibility for a refund where changes of ownership" occurred.  R. 393.   The agency's policy in such circumstance is to presume that the "owner *during the consent order period*" – i.e., the period in which overcharges occurred – "should receive the refund."  <u>Id.</u>  In this case, National Steel was the "owner" in the period in which the overcharges occurred, and it therefore experienced the impact of the overcharges.  That presumption could be "rebutted if the present owner [could] show that either (a) the owner during the price control period was a corporation whose corporate stock was purchased by the current owner or (b) the business was transferred under a contract that specified potential refunds, either expressly or implicitly, as one of the assets being transferred."  <u>Id.</u>  Mittal claims that National Steel transferred to Weirton Steel the right to claim a refund, which in turn Mittal received from Weirton Steel.

The Federal Defendants' opening papers analyzed the standard of review that is

applicable in this case.  Memo. At 11-13.  The agency's decision will not be overturned unless it is in excess of authority or based on findings not supported by substantial evidence.  <u>Id.</u> at 12.  ***Phoenix Petroleum Co. v. Federal Energy Regulatory Comm'n***, 95 F.3d 1555, 1567 (Fed. Cir. 1996).  If that standard is satisfied, the agency's decision should be accorded great deference and sustained if it has a rational basis.  ***International Drilling and Energy Corp. v. Watkins***, 920 F.2d 14, 18 (Temp. Emer. Ct. App. 1990).

The agency's decision in this case focused on vindicating its policy of granting refunds only to firms that were harmed by oil overcharges, in the absence of evidence showing that such firms intended to transfer their claims to others.  Just because the agency, during the course of applying that policy, was required to review evidence presented by Mittal that included a contract does not mean that the standard of review required by applicable statute and controlling precedent should be jettisoned.  It is enough that Mittal posits a novel legal theory in its attempt to circumvent the agency's policy.  Mittal should not be allowed to circumvent the standard of review applicable here, and its argument that it is entitled to de novo review should be rejected.

B.    NATIONAL STEEL HAD THE UNCONDITIONAL RIGHT, IN 1989, TO FILE A REFUND CLAIM ON ITS OWN BEHALF

Mittal attempts to show over the course of fourteen pages of argument, Pl. Memo. at 24 - 37,  that OHA erred in finding that Mittal was not the "proper party to receive the refund."  R. 393.  Mittal's efforts do not withstand scrutiny, as is shown below.  Before discussing the specifics of Mittal's arguments, however, the Federal Defendants submit that there is one point about Mittal's approach to this case that must be kept in mind.

Mittal starts with the proposition that the case hinges on the interpretation of the agreement between National Steel and Weirton Steel.  Having said that, however, Mittal does

not engage in any recognized approach in the law to the interpretation of a contract. Rather, Mittal attempts first to superimpose the language of its novel legal theory onto the actual language of the contract, e.g., the word "claims," and then conveniently provide its own interpretation of such language. That approach, of course, overlooks the principal standard of contract interpretation: discerning the parties' intent, as it is expressed in the contract's language, is the primary goal. We will demonstrate that the clear intent of National Steel and Weirton Steel, as memorialized in the language of their contract, is sufficient to refute both Mittal's novel legal theory and its contract interpretation.

    1. <u>Section 3.1 of the National Steel–Weirton Steel Agreement</u>

Mittal first argues that OHA erred in construing the contract between National Steel and Weirton Steel. Pl. Memo. at 24-27. Specifically, Mittal says that OHA misconstrued Section 3.1 by not realizing that the sentence quoted by OHA in its decision, R. 394, is modified by the language in the four of the five sentences of this section discussing a "rebate, refund or reduction in rates" from two vendors: The Columbia Gas System and the Consolidated Rail Corporation. Pl. Memo. at 25; R. 319. In essence, Mittal says those words limit the application of this section to recoveries from a "vendor" and not from the "United States." <u>Id.</u> at 26.

That interpretation is simply unsupportable. While four of the five sentences of Section 3.1 do mention vendors, they also refer to a "refund" from "any other Person." R. 319-20. As OHA correctly noted, the word "Person" is defined for the purposes of the agreement to mean any "government or any agency or political subdivision thereof." R. 394; R. 373. More specifically, Section 3.1 provides, in pertinent part, as follows:

        . . . . The Seller [National Steel] will retain for it own
        account any payments received from . . . any other

<u>Person</u> representing overcharges or refunds prior to
the Purchase Date. . . . .

R. 319 (emphasis added). Clearly, this section applies to the refunds at issue here. Moreover,

what Mittal construes this section to mean is not what the parties to the agreement meant. A

government or political subdivision of a governmental body hardly qualifies as a "vendor."

Mittal also argues that the "refund" language of this section does not apply because

National Steel did not buy crude oil from any of its vendors. Pl. Memo. at 27. This contention is

nothing more than a red herring and should be dismissed out of hand for a number of reasons.

First, the fund administered by OHA, against which National Steel and Mittal made claims, was

not established to provide refunds to parties that purchased crude oil. Rather, it was established

under OHA's Modified Statement of Restitutionary Policy to allow persons who had  purchased

refined petroleum products, such as the No. 6 residual fuel oil that National Steel purchased for

its Weirton plant. Memo. at 6-9; R. 392. Therefore, the fact that National Steel did not purchase

crude oil for the Weirton plant is irrelevant.

Furthermore, the parties to the agreement, especially National Steel, did not negotiate the

language of Section 3.1, as well as other pertinent sections of the agreement, only for the limited

purpose of identifying the right to claim refunds from OHA. Rather, it is clear that the parties

were taking a broad view of what rights and liabilities would or would not be transferred under

the agreement. The parties used the purchase date as temporal reference point to memorialize

their agreement as to how they had divided the rights and responsibilities covered by the

agreement. Thus, the first and second sentences of Section 3.1 describe what rights National

Steel had, as of the purchase date, to the refunds, rebates and reduction in rates specified in the

contract. In a similar manner, the third and fourth sentences of Section 3.1 describe Weirton's

rights, as of the purchase date, to refunds, rebates and reductions in rates. The fifth and last sentence of this section expresses the rights National had to collect the refunds, rebates and reductions in rates to which it was entitled.

Finally, contrary to Mittal's contention, Pl. Memo. at 26-27, it is of no moment that the agreement had other provisos delineating the rights and responsibilities of the parties in other circumstances. National Steel and Weirton were free to express the agreement they reached in any terms that were not unlawful or contrary to public policy. Mittal does not contend that these other provisos, which will be discussed below, are contrary to or contradict the language of Section 3.1. If anything, they reinforce our position that the parties were trying to delineate their rights and responsibilities as broadly as possible, and not narrowly as Mittal argues.

2. Section 7.2 and 7.4 of the National Steel–Weirton Steel Agreement

Mittal's other merits argument involves Sections 7.2 and 7.4 of the agreement between National Steel and Weirton Steel. Pl. Memo. at 28-37. The linchpin of Mittal's argument is that National Steel did not have the right, on its own behalf, to submit a refund claim because that right resided in Weirton Steel, which eventually transferred it to Mittal. Pl. Memo. at 29-35. Here, even taking into account that Mittal's legal position is novel, Mittal's reach exceeds its grasp.

The core of this argument is that National Steel did not have the right to claim a refund because OHA, as of the time of National Steel's agreement with Weirton Steel, had not issued its Modified Statement of Restitutionary Policy. National Steel and Weirton Steel reached their agreement in 1983 and OHA issued its policy in 1986. For a number of reasons, Mittal's position cannot be sustained.

-9-

First, whether a party has a right to a refund exists independent of another party's recognition of that right. Thus, the fact that OHA had not provided a procedure that would have allowed firms like National Steel to file claims on the overcharge funds that had been collected does not mean National Steel did not have a right to pursue the overcharges it paid when purchasing No. 6 residual fuel oil for the Weirton plant, and Mittal recognizes that fact. Pl. Memo. at 33.

Mittal's argument is simply an attempt to use sleight of hand and superimpose the elements of its novel legal theory on the agreement between National Steel and Weirton Steel. Assuming for the sake of argument that there was no process established for end users to make a claim on the crude oil funds, that by itself does not negate National Steel's right to claim or recover overcharges elsewhere or by other means. Nor does it mean that Mittal's novel legal theory suddenly becomes the source of, or supply the content for, the National Steel–Weirton Steel agreement.

Sections 7.1, 7.2 and 7.4 of the contract clearly express the parties' agreement as to how the rights to claims were allocated between them. Thus, Section 7.1 provides that "Pending Proceedings," specific matters listed in an attachment to the agreement, R.383-91; see Pl. Memo. at 30, would be the responsibility of National Steel. R. 327-28. Section 7.2 provides that National Steel would be responsible for "Proceedings"[1] that "involve claims based on facts occurring or existing prior to the Purchase Date." R. 328. Section 7.4 provides that Weirton Steel would be responsible for "Proceedings" that "involve claims based on facts occurring on or after the Purchase Date." R. 329.

---

[1] The term "Proceedings" is defined in the agreement's Glossary. R. 341-42.

Mittal argues that the "Proceeding" in this case is the procedure OHA established in its Modified Statement of Restitutionary Policy, and that such "Proceeding" was not a "Pending Proceeding." The second clause of the preceding sentence, which describes part of Mittal's argument, is both correct and irrelevant. The only matters that could be "Pending Proceedings" are those listed in an attachment to the agreement, R. 384-91; see Pl Memo. at 30, and those were to be the responsibility of National Steel according to the language of Section 7.1. R. 327-28. Mittal then asserts that, because the refund procedure established by OHA's Modified Statement of Restitutionary Policy was not a "Pending Proceeding," National Steel did not retain the right to make a claim to OHA. Pl. Memo. at 30.

That is absurd. Section 7.1 gives National Steel the responsibility for "Pending Proceedings." R. 327. But Section 7.2 also expressly gives National Steel the Responsibility for "Proceedings" – i.e. matters other than "Pending Proceedings" – "to the extent that such Proceedings involve claims based on facts occurring or existing prior to the Purchase Date." R. 328. In other words, National Steel had the right under the agreement to file a claim because a "Proceeding" includes a claim against any "Person" or a "suit" or "request for relief which may be brought in any . . . administrative agency or legal forum in which the Seller . . . is named as a party or which may affect the business of the Division or the Buyer . . . ." R. 341-42. Since National Steel's claim related to purchases of No. 6 residual fuel oil it made for the Weirton plant before the "Purchase Date," the agreement clearly gave National Steel the right to submit the claim to OHA..

Mittal, however, asserts that National Steel did not have such right because all of the "facts" upon which the claim was based did not occur prior to the Purchase Date. Pl. Memo. 33-

35.  It is here that Mittal makes its most breathtaking assertion by attempting to define what National Steel and Weirton Steel meant in using the word "facts."  Mittal argues that one element of such fact necessarily subsumed by the parties' agreement is "a recognized right to make a claim."  Pl. Memo. at 34.  Mittal asserts that such "fact" implicates the issue of "whether a cause of action exists, i.e., whether there is [a] recognized theory upon the basis of which a claim be made." Pl Memo. at 34.  Mittal concludes this leap of logic by stating that a "claim has not occurred and does not exist" if there is no "recognized right to relief."  Id.

It is clear that the parties to the agreement did not harbor such an interpretation.  National Steel filed a claim and Weirton neither objected nor filed its own claim.  Compl. ¶¶ 18, 20, 22.  Even Mittal did not initially have the understanding that it now asserts here until it was brought to its "attention."  Compl. ¶ 24.  The purported ignorance of, and inability of National Steel, Weirton Steel and even Mittal itself initially to understand, the meaning of the agreements they signed would indeed be breathtaking in scope if the argument now offered by the Plaintiff were correct.  Indeed, the Federal Defendants submit that a person would have to willingly engage in the suspension of his or her powers of disbelief to accept this argument.

It is clear that National Steel and Weirton Steel both agreed that National Steel would retain the right to file type of claim that National Steel eventually submitted to OHA in 1989.  The Court should accord Mittal's novel legal theory the short shrift it deserves and dismiss it out of hand with prejudice.  Finally, in light of the clear evidence showing that National Steel retained the right to submit its claim to OHA in 1989, Mittal's argument, Pl. Memo. at 38-43, regarding its right to file a claim irrespective of the waiver made by National Steel's affiliate is moot and need not be addressed.

V.  <u>CONCLUSION</u>

Mittal has not demonstrated either that the agency acted in excess of its authority or that the decision is based on findings that are not supported by substantial evidence.  The agency acted to vindicate its policy of ensuring that refunds are made only to firms injured by overcharges.  Mittal's attempt to show that National Steel (the firm that was injured by the oil overcharges) sold its claim to Weirton Steel, and that Weirton Steel thereafter sold the claim to Mittal, is not  supported by the record.  Indeed, the record supports the opposite conclusion.  The actions of both National Steel and Weirton Steel prove that neither firm had the intent to transfer the claim, or believed that it had been transferred, under the terms of their agreement.  Moreover, even Mittal Steel did not know that it had allegedly purchased the claim until it was made "aware" of that fact some time after it had reached the agreement with Weirton Steel.  The agency's decision has a rational basis and it must be accorded deference.   Accordingly, the Federal Defendants respectfully request that the Court grant their motion for summary judgment, deny Mittal's motion for summary judgment, and dismiss Mittal's complaint with prejudice.

Respectfully submitted,


_____
PAUL T. MICHAEL (202) 586-1303
THOMAS H. KEMP (202) 586-5550
STEPHEN C. SKUBEL (202) 586-1303
United States Department of Energy
Office of the General Counsel, GC-32
Room 6H-087
1000 Independence Avenue, S.W.
Washington, D.C.  20585

Dated March 31, 2006