IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

MITTAL STEEL USA ISG, INC.
4020 Kinross Lakes Parkway
Richfield, OH 44286


      Plaintiff

       V.                   CIVIL ACTION NO.

SAMUEL BODMAN             05-1466(ESH)
Secretary of Energy, United States
1000 Independence Ave. S.W.
Washington DC 20585

GEORGE B. BREZNAY
Director, Office of Hearings and Appeals
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington DC 20585


      Defendants

---

PLAINTIFFS' STATEMENT OF POINTS AND AUTHORITIES
IN REPLY TO FEDERAL DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT




                     Philip P. Kalodner
                     208 Righters Mill Road
                     Gladwyne PA 19035
                     DC Bar 973578

April 12, 2006            Attorney for Plaintiff

TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT                          1

ARGUMENT                                                      5

I   DOE HAS ACKNOWLEDGED THAT THE ISSUE IS CONTRACT
INTERPRETATION, AS TO WHICH THE LAW REQUIRES JUDICIAL
DE NOVO REVIEW; MOREOVER THE DOE POLICY WHICH IS
BEING APPLIED IS BEST SERVED BY THE INTERPRETATION
FOR WHICH ISG CONTENDS                                        5

II   DOE'S EFFORT TO INTERPRET THE A & A AGREEMENT
AS PROVIDING FOR NATIONAL STEEL'S "RETENTION" OF A
RIGHT TO CRUDE OIL REFUNDS FOR THE WEIRTON PURCHASES
IS BASED ON A FALSE PREMISE, MISINTERPRETS THE
"REFUND" PROVISION, AND MISAPPLIES THE "PROCEDURES"
PROVISIONS TO HAVE NATIONAL STEEL RETAIN A RIGHT
WHICH DID NOT EXIST IN 1983                                   9

      A. DOE Incorrectly Reads The "Refund" Provisions
      of the A & A  Agreement as Determining The Right
      To Crude Oil Refunds                                    11

      B. DOE Agrees That The "Proceedings" Provisions
      of the A & A Agreement Apply, But Unsuccessfully
      Seeks To Avoid The Fact That The Crude Oil Refund
Proceedings Involve Claims Based On Facts Not
      Occurring or Existing Prior to the Purchase Date        13

CONCLUSION                                                    20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

MITTAL STEEL USA ISG, INC.
4020 Kinross Lakes Parkway
Richfield, OH 44286


        Plaintiff

        V.                                CIVIL ACTION NO.

SAMUEL BODMAN                             05-1466(ESH)
Secretary of Energy, United States
1000 Independence Ave. S.W.
Washington DC 20585

GEORGE B. BREZNAY
Director, Office of Hearings and Appeals
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington DC 20585


        Defendants
_____


PLAINTIFFS' STATEMENT OF POINTS AND AUTHORITIES
IN REPLY TO FEDERAL DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT


INTRODUCTION AND SUMMARY OF ARGUMENT

        The Federal defendants ("Department of Energy" or "DOE")
have filed an Opposition to Plaintiff Mittal Steel USA ISG
Inc.'s, (hereafter "ISG") Motion for Summary Judgment which
agrees with ISG that the issue is whether when it filed an
application in 1989 seeking crude oil refunds from DOE, National
Steel Corporation ("National Steel") owned the right to such

1

refunds or was instead acting as an agent for the Weirton Steel Corporation ("Weirton Steel") to whom it had six years previously sold the steel manufacturing facility at Weirton, West Virginia at which the refined petroleum products which were the basis of the claim for crude oil refunds had been purchased during the relevant 1973 to 1981 regulatory period.

DOE offers no opposition to the claim of ISG that if it is correct in maintaining that the right to crude oil refunds for which National Steel applied belonged to its successor owner, Weirton Steel, then ISG as the acquirer of the Weirton facility and its assets is entitled to the crude oil refunds and that its motion for reconsideration of the National Steel application was improperly denied.

DOE agrees, too, that the issue turns on the interpretation of the Assignment and Assumption Agreement ("A & A Agreement") pursuant to which National Steel sold its Weirton facility to Weirton Steel in 1983.

DOE quarrels with ISG only (I) as to the standard to be applied in the judicial review of the interpretation of the A & A Agreement by DOE's Office of Hearings and Appeals ("OHA"), and (ii) in interpreting the two possibly relevant provisions of the A & A Agreement.

As to the standard of review, DOE argues that the Court should defer to the OHA interpretation, evidently out of a

concern that a de novo review would result in the Court agreeing with ISG that when the right to crude oil refunds was created in 1986, it was owned by Weirton Steel, so that National Steel was acting as Weirton Steel's agent in applying for crude oil refunds in 1989.

But DOE is in error as to the standard of review. DOE's acknowledgment that the right to crude oil refunds turns on interpretation of the A & A Agreement necessarily invokes the rule enunciated by the Court of Appeals for the Federal Circuit that where a DOE decision turns on the interpretation of a contract, the District Court's review is de novo. <u>Consolidated Edison Co. V. Richardson</u>, 232 F. 3d 1380, 1383 (D.D.C. 2000).

As to the relevant contract language,

(a) DOE's argument that the contract's "refund" provision (Section 3.1 of the A & A Agreement) applies fails because (I) a refund is necessarily received from one from whom a purchase was made and National Steel never purchased from the DOE, and (ii) a refund must be as to a product purchased, and National Steel never purchased crude oil, but only refined products;

(b) DOE's argument that the under the "Proceedings" provisions (Sections 7.2 and 7.4 of the A & A Agreement), National Steel "retained" the right to claim crude oil refunds even though no such right existed as of the sale to Weirton Steel is of no avail because of (I) its failure to recognize that not

3

only was there no procedure for claiming crude oil refunds at the time of the sale by National Steel to Weirton, but more critically there was no right to make a claim, i.e. no cause of action, and (ii) it depends, without basis, on an assumption that when National Steel applied for crude oil refunds in 1989, it and Weirton Steel were aware of the fact that the right to claim crude oil refunds had not existed in 1983, indeed was not created until 1986.

In sum, under a proper de novo interpretation of the A & A Agreement language, when the right to crude oil refund claims was created in 1986, it was a right owned by Weirton Steel, and the disability which precluded National Steel from claiming crude oil refunds as a principal did not disable it as an agent for Weirton Steel which was under no such disability.

DOE makes no challenge to the fact that any crude oil refund claim right owned by Weirton Steel has been conveyed to ISG. Nor does DOE challenge the ISG argument that if National Steel was as a matter of law acting as an agent for Weirton Steel in filing its application for crude oil refunds, the DOE erred in denying the claim on the basis of National Steel's disability as a principal, and therefore ISG's Motion for Reconsideration was improperly denied.

Finally, DOE makes no response at all to ISG's contention that even if National Steel somehow obtained the right to crude

oil refunds in 1986 when the right was created, it was only the right to such refunds as existed in 1983 when the Weirton facility was sold by National Steel to Weirton Steel; such refunds were only some 15% (perhaps 30% with interest) of the refunds which have been distributed. See ISG's Statement In Support of Plaintiff's Motion for Summary Judgment ("ISG's Initial Brief") at 35-37.

<u>ARGUMENT</u>

I    <u>DOE HAS ACKNOWLEDGED THAT THE ISSUE IS CONTRACT INTERPRETATION, AS TO WHICH THE LAW REQUIRES JUDICIAL DE NOVO REVIEW; MOREOVER THE DOE POLICY WHICH IS BEING APPLIED IS BEST SERVED BY THE INTERPRETATION FOR WHICH ISG CONTENDS</u>

DOE has acknowledged both in word and in deed, that the determination of whether it was National Steel or Weirton Steel which had the right to crude oil refund claims turns on the interpretation of a contract, the A & A Agreement:

(I) DOE acknowledges such "in word" by defining the OHA-DOE policy as one in which the initial presumption that the owner of the facility at which the purchases were made at the time of such purchases is entitled to any crude oil refunds is "rebutted if the present owner (could) show that... (b) the business was transferred under a <u>contract that specified potential refunds, either expressly or implicitly, as one of the assets being</u>

5

transferred." (Federal Defendants' Reply in Opposition, at 5, hereafter "DOE Opposition", quoting the OHA Decision here on judicial appeal, Administrative Record, at 393, emphasis supplied). As so acknowledged, the issue turns on the interpretation of A & A Agreement.

(ii) DOE acknowledges that the issue is one of contract interpretation "in deed" when it turns, as did OHA in the Decision appealed, to interpretation of the two arguably relevant portions of the A & A Agreement as the determinative factor as to the ownership of the right to crude oil refunds for purchases at the Weirton facility.

Thus, both OHA in its Decision and DOE in its Reply in Opposition agree with ISG that the issue turns on contract interpretation of the language of the A & A Agreement with regard to "refunds" (Section 3.1) and "claims based on facts occurring or existing prior to the Purchase date." (Section 7.2)

DOE cites no authority in contradiction to the clear and unambiguous holding of the Federal Circuit in Consolidated Edison Co. V. Richardson, supra, 232 F. 3d at 1383 that where the issue is the interpretation of a contract, review is "de novo" and that it is incorrect for a District Court to employ a "deferential standard of review." For additional authorities to the same effect, see p. 22-24 of Plaintiff's Initial Brief".

Significantly, in Consolidated Edison Co. v. Richardson,

supra, the Federal Circuit declared that review was "de novo" even where (I) the contract in question was one specifically dealing with energy regulatory matters, the very domain of OHA and DOE, and (ii) the term being interpreted was one of art relating to energy regulation, i.e. "Alleged crude oil violations."

So much the clearer is the appropriateness of de novo review where, as here, the contract is not specifically related to regulatory matters but is instead a classic acquisition agreement, and where the terms being interpreted, i.e. "refunds" and " claims based on facts... existing prior to the Purchase Date" are not terms as to which DOE and OHA have any particular expertise.

If deference to OHA and DOE is improper even where they have special knowledge because the contract deals with matters in their province and where the terms being interpreted are similarly matters as to which they have special knowledge, then clearly no deference is due as to the interpretation of a general acquisition agreement and of terms of general applicability.

DOE's insistence on arguing for a deferential review standard when the law is clearly and unmistakably to the contrary is perhaps most significant in revealing DOE's concern that if a de novo standard is employed, the OHA interpretation of the A & A Agreement will be rejected, and the Court will accept the

7

interpretation urged by ISG, and will determine that it was Weirton Steel, and now ISG, which has the right to crude oil refunds for the purchases at the Weirton facility.

In any event, the requirement for de novo review of contract interpretation is not, as DOE seems to suggest, superceded because of a "policy of granting refunds only to firms that were harmed by crude oil overcharges" (DOE Opposition at 6):

(I) In the first place, that "policy" clearly includes an award to a successor under a contract so providing "either expressly or implicitly." (DOE Opposition, at 5);

(ii) In the second place, here the award to ISG as the current owner of the Weirton facility which was harmed by crude oil overcharges passed on to it in purchased refined product would serve the relevant aspects of the DOE "policy".

If ISG is here successful, some $1.4 million in crude oil refunds will be distributed to it as the owner of the facility at which the purchases of refined product were made on the basis of which the crude oil refunds are calculated, and will accordingly be available to assist in the economic viability and continued operation of the Weirton steel facility. ( 71 Fed. Reg. 2195, January 13, 2006).

If, on the other hand, this Court sustains OHA's denial of crude oil refunds to ISG, the $1.4 million will be disbursed pro rata to 31,000 claimants who do not have, nor ever had, any

8

relationship to the Weirton steel facility. Id

   The former result is clearly more consistent with the purpose and goal of the crude oil refund program, i.e. to make restitution to facilities injured by crude oil overcharges by virtue of the adverse effects which such overcharges had on the prices such facilities were required to pay for refined petroleum product. Although ISG is a new owner of the Weirton facility, there is presumably a continuity both as to the labor force employed at the facility and as to the customers purchasing the product of the Weirton facility. Disbursement of $1.4 million to the current owner of the facility holds the promise of assisting either its labor force or its customers, or both, while the disbursement to 31,000 claimants of crude oil refunds for overcharges which affected the Weirton steel facility provides no such benefits.


II   DOE'S EFFORT TO INTERPRET THE A & A AGREEMENT AS PROVIDING FOR NATIONAL STEEL'S "RETENTION" OF A RIGHT TO CRUDE OIL REFUNDS FOR THE WEIRTON PURCHASES IS BASED ON A FALSE PREMISE, MISINTERPRETS THE "REFUND" PROVISION, AND MISAPPLIES THE "PROCEDURES" PROVISIONS TO HAVE NATIONAL STEEL RETAIN A RIGHT WHICH DID NOT EXIST IN 1983

   The premise of the DOE argument as to the interpretation of the A & A Agreement is that the parties had an "intent" with

9

regard to potential crude oil refunds, and the object is to determine that "intent" from the language of the Agreement.

The premise is clearly false.

As ISG pointed out in its Initial Brief, as of the May 1, 1983 Purchase Date under the A & A Agreement there was no right of purchasers of refined petroleum product to obtain such crude oil refunds as had been or would be recovered by the DOE in enforcement actions against overcharging producers of crude oil. Indeed, in some cases both Congress and the Courts had used such recovered refunds to fund certain State program required by Congress, while in other cases DOE had provided for the distribution of recovered funds to the U.S. Treasury for appropriation by the Congress. (See authorities cited in ISG's Initial Brief, at 11).

Although in some other settlements of enforcement actions, DOE had held the funds for subsequent determination as to their distribution, it successfully resisted any efforts by purchasers of refined petroleum products to obtain such refunds, see e.g. United States v. Exxon, 773 F. 2d 1240 (TECA 1985). Indeed, in July, 1985, in a formal policy statement, the DOE confirmed its past determination to reject the claims of others and advised that as parens patriae it would retain the recovered crude oil refunds in its control for use by the federal government. (Statement of Restitutionary Policy, 7 Energy Mgmt. (CCH) par.

10

90,508, 50  Fed. Reg. 27,400, July 2, 1985).

Accordingly, even if National Steel and Weirton Steel had known of the existence of crude oil refunds, and there is no such evidence, they could not have contemplated as of the 1983 sale that such refunds would be available to purchasers of refined products who had never purchased crude oil, and therefore could not have formed an intent as to the right to such funds as between them.

The object here is to determine what the parties intended as to funds which might become available by virtue of a right to such funds created subsequent to the 1983 A & A Agreement.

Turning now to that language:

A. DOE Incorrectly Reads The "Refund" Provisions of the A & A  Agreement as Determining The Right To Crude Oil Refunds

As noted in ISG's Initial Brief, the provision of the A & A Agreement allocating to National Steel any "refunds" of amounts it had paid to a vendor from whom it had made purchases while it owned the Weirton facility has no applicability here for two reasons:

(I) The purchases of refined petroleum product on the basis of which crude oil refunds are to be awarded were not from the United States, and when the DOE is distributing crude oil refunds, the United States is not refunding a portion of a purchase price it never received from National Steel;

11

(ii) What the DOE is distributing is not a refund of a portion of the purchase price paid by purchasers of refined petroleum product, but compensation for the fact that the prices paid by purchasers for refined product to the vendors from who they purchased were higher than they should have been because of overcharges by producers of crude oil to the refiners who made refined petroleum products. Indeed, for the most part, the crude oil refunds being distributed related to overcharges by refiners from whom no purchases were made for use at the Weirton facility. Such compensation is not a "refund."

DOE's response to those facts are of no avail in making the "refund" provision applicable here:

(I) As to the fact that any distribution of crude oil monies by the United States could not be a refund of overcharges by the United States because the United States had never sold refined product to National Steel, DOE argues only that the United States is a "person" who could have been the source of refunds covered by the provision. (DOE Opposition, at 7-8).

DOE's assertion is both correct and irrelevant.

Had National Steel purchased either refined petroleum product or crude oil from the United States, and had it been overcharged by the United States, and had the United States refunded any portion of the purchase price, the "refund" provision would apply. But, National Steel did not purchase from

the United States and any distribution by the United States of
funds ir had recovered from others could not be deemed a refund
from a person from whom National Steel had purchased.

(ii) As to the fact that any distribution of crude oil
monies is not a refund of prices paid for refined petroleum
product, but rather compensation for the fact that the refined
product purchase prices were higher than justified by virtue of
the fact that refiners had been overcharged for the crude oil,
DOE expresses no disagreement.

DOE merely characterizes the ISG point as "nothing more than
a red herring", but provides no support for such characterization
other than pointing out that the distribution was of crude oil
monies while the beneficiaries of the distribution were those who
had purchased refined petroleum products.

ISG agrees. Indeed it is precisely because of that fact that
the "refund" provision of the A & A Agreement is not relevant,
but the "Proceedings" provisions are.

B. <u>DOE Agrees That The "Proceedings" Provisions of the A & A
Agreement Apply, But Unsuccessfully Seeks To Avoid The Fact That
The Crude Oil Refund Proceedings Involve Claims Based On Facts
Not Occurring or Existing Prior to the Purchase Date</u>,

ISG argued before OHA and in its Initial Brief here that (I)
the crude oil refunds are obtained in and by virtue of
"Proceedings" before the DOE, and (ii) because, as of the

13

effective date of the A & A Agreement there was no right in
purchasers of refined petroleum product such as National Steel to
claim crude oil refunds, one of the three necessary critical
"facts" did not exist pursuant to which a crude oil refund claim
could be pursued, indeed did not occur until three years later,
thereby entitling the purchaser Weirton Steel, not the seller
National Steel to pursue such claims as a principal.

In its Opposition brief, DOE appears to concur as to the
applicability of the "Proceedings" Provision, albeit insisting
that the principle applicable provision is the "refund" provision
discussed above. For the reasons set forth above and in ISG's
Initial Brief, ISG is of the view that the crude oil
distributions are not "refunds" but are the result of
"proceedings", making the "proceedings" provisions (Section 7.2
and 7.4 of the A & A Agreement) the critically applicable ones.

DOE argues that despite the "fact" that there was no right
of purchasers of refined product to claim crude oil refunds when
the A & A Agreement was executed and therefore the parties could
not have contemplated the retention of such a right by National
Steel, National Steel did somehow obtain such an unanticipated
right to claim when such a right was created three years later.

DOE appears to rely on three arguments to contend that
National Steel "retained" a right which did not come into
existence until three years later. None of them have merit:

14

1. In apparent recognition of the fact that the "facts" which form the necessary basis of "claims" under the "proceedings" provisions include the necessity that there be a recognized right of purchasers of refined petroleum products to claim crude oil refunds, DOE argues that there was such a right even though not recognized by DOE. DOE suggests, indeed, that all that was missing in 1983 was a "procedure" for asserting that right. (DOE Opposition, at 10).

Such a contention that the right of refined product purchasers to crude oil refunds existed in 1983 when the A & A Agreement became effective (indeed at any time prior to 1986 when such a right was created by a Settlement Agreement in In Re The Department of Energy Stripper Well Exemption Litigation ("Stripper Well"), 653 F. Supp. 108 (D. Kan. 1986) is inconsistent with the contemporary actions of the executive, legislative, and judicial branches of the federal government.

The executive branch, acting by the DOE, not only had regularly provided in settlements of crude oil overcharge allegations for refunds to go to the U.S. Treasury for appropriation by the federal government ( (See, e.g. Payne 22 Inc. V. United States, 762F. 2d 81 (TECA 1985), Cities Service Co. V. DOE, 715 F. 2d 572 (TECA 1983)), but was insisting in the Stripper Well litigation that it had the right to do so as to all crude oil refunds. Indeed, as late as July 1985, more than two

years after the A & A Agreement , in a formal policy statement, DOE confirmed its past determination to reject the claims of others and advised that as parens patriae it would retain the recovered crude oil refunds in its control for use by the federal government. (Statement of Restitutionary Policy, 7 Energy Mgmt. (CCH) par. 90,508, 50  Fed. Reg. 27,400, July 2, 1985).

The judicial branch had regularly rejected efforts of purchasers of refined products to assert the right to crude oil refunds; see, for example, the definitive rejection of such in United States v. Exxon Corp., 773 F. 2d 1240 (TECA 1985), where the Court rejected the efforts of refined product purchasers to claim the right to crude oil refunds, affirming a District Court determination to distribute the refunds to the States of the United States to implement a federal program for assistance to persons with low income in paying their heating bills.

Indeed in doing so, the Court was following the example of the legislative branch of the federal government, the U.S. Congress, which had appropriated $200 million of the crude oil refunds which had been recovered by the DOE for that same federal program. Warner Amendment, Pub. L. No. 93-377 Sec. 155, 96 Stat. 1830 (1982)).

With a uniform refusal of the executive, judicial and legislative branches of the federal government to recognize any right of purchasers of refined petroleum products to claim crude

16

oil refunds, it is difficult to see how any such right can be said to have "existed", as DOE argues in its Opposition, at p. 10. It is certainly inconceivable that the parties to the A & A Agreement could have contemplated the retention of such a non-existing right by the seller, National Steel.

2. Alternatively, and clearly inconsistently, DOE appears to suggest that the lack of a right in refined product purchasers to claim crude oil refunds as of the 1983 Purchase Date is irrelevant, i.e, that the only relevant "fact" is that "National Steel's claim related to purchases of No. 6 residual fuel oil it made for the Weirton plant before the 'Purchase Date'" (DOE Opposition, p. 11).

To so interpret the "Proceedings" provisions would divine an intent in the parties for National Steel to retain a right which did not exist at the time National Steel sold its Weirton operations to Weirton Steel.

The only logical and rational reading of the critical language "claims based on facts occurring or existing prior to the purchase date" is that it requires three "facts" for any claim to exist-- (I) the events on the basis of which the claim is made, here the purchase of refined petroleum products during the regulatory period, must have occurred ,(ii) there must be a right to claim on the basis of such events, and (iii) there must be a fund against which the claim may be made.

17

Here, (I) the first of those "facts" had occurred, (ii) the second "fact" had not occurred and would not occur until three years after the Purchase Date, and (iii) the third "fact" existed only to a very limited extent.

With regard to this third "fact", although a fact finding would be required to determine the amount of crude oil refunds which existed as of the Purchase Date, as noted in ISG's Initial Brief, only a very small part of the crude refunds existed as of the Purchase Date, and only such amount would be an existing "fact" for the purpose of any claim by National Steel as a principal, even if the fact that no right to claim existed is ignored. ( As late as February, 1988, almost five years after the May 1, 1983 Purchase Date, the amount of refunds recovered by DOE would have provided refunds of slightly in excess of $300 per million gallons of petroleum product purchased by the claimant. See <u>Ernest E. Allerkamp</u>, 17 DOE (CCH) par. 85,079 (1988). Such is a small part of the almost $2300 per million gallons being distributed to claimants in the DOE crude oil refund proceedings.)

Significantly, DOE does not address at all this issue of the "facts" as they existed as of the Purchase Date as to the amount of crude oil funds. Perhaps its failure to do so is a recognition of the absurdity of believing that the parties intended that National Steel was retaining a claim as to funds which did not

exist as of the Purchase Date.

3. Finally, in a last somewhat desperate attempt to establish that the parties to the A & A Agreement intended for National Steel to "retain" a non-existent right to claim crude oil refunds which largely did not exist, DOE argues that the fact that National Steel filed a crude oil refund claim and Weirton Steel neither objected nor filed its own claim demonstrates that the parties intended that the claim which came into existence three years after the Purchase Date would belong to National Steel.

The argument depends and relies on an assumption as to which there is not a single shred of evidence, i.e. that Weirton Steel and National Steel were aware at any time that (I) the right of refined petroleum purchasers to claim crude oil refunds did not exist on the Purchase Date and indeed was not created until three years later, or (ii) that the amount of crude oil refunds which were to be distributed by DOE did not, to a very substantial extent, exist as of the Purchase Date.

It is only if the parties were aware of both those "facts" that their conduct in filing (in the case of National Steel) or not filing (in the case of Weirton Steel) can be read as constituting a claim on the part of National Steel and an admission on the part of Weirton Steel that the right to crude oil refunds, and all crude oil refunds, belonged to National

19

Steel.

Moreover, not only is there a lack of evidence that National Steel and Weirton Steel were aware of the actual facts with regard to the creation of the right to claim and the amount of funds available when the former filed and the latter did not, but it strains credulity to believe that Weirton Steel would not have objected to the National Steel filing and would not have itself filed had it known the facts. It could, and indeed would have, made the same argument ISG is here making had it understood the facts.

CONCLUSION

For the reasons above set forth and set forth in Plaintiff's Statement in Support of Plaintiff's Motion for Summary Judgment, this Court is respectfully requested to

(I) reverse the denial by OHA of ISG's Motion for Reconsideration seeking crude oil refunds for the purchase of refined petroleum products by National Steel Corporation at the Weirton, W. Va. Steel manufacturing facility now owned by ISG, and for whose predecessor owner, the Weirton Steel Corporation, National Steel Corporation was acting as agent in asserting such claim;

(ii) direct defendants in their official capacities with OHA and DOE to award to ISG crude oil refunds for such purchases to

the same extent as all other claimants who have already received crude oil refunds and to whom additional crude oil refunds are being distributed.

The opportunity to offer oral argument in support of the Plaintiff's Motion for Summary Judgment is respectfully requested.

Respectfully submitted,

_____

Philip P. Kalodner
208 Righters Mill Road
Gladwyne PA 19035
DC Bar 973578

April 12, 2006                    Attorney for Plaintiff

21