## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————— )
)
**MITTAL STEEL USA ISG, INC.,** )
)
**Plaintiff,** )
)
v. )     **Civil Action No. 05-1466 (ESH)**
)
**SAMUEL BODMAN, Secretary of Energy,** )
*et al.*, )
)
**Defendants.** )
—————————————————————— )

## MEMORANDUM OPINION AND ORDER

Before the Court are cross-motions for summary judgment filed by defendants Samuel

Bodman, the Secretary of Energy, and the Office of Hearings and Appeals ("OHA") of the

Department of Energy ("DOE") and plaintiff Mittal Steel USA, ISG, Inc. ("ISG").  At issue is

whether OHA properly interpreted an Assignment and Assumption Agreement ("Agreement")

between plaintiff's predecessor-in-interest, Weirton Steel Corporation ("Weirton Steel"), and the

National Steel Corporation ("NSC").  Since the Court finds that OHA correctly interpreted the

contract, it grants defendants' motion.

## BACKGROUND

In 1973, Congress enacted the Emergency Petroleum Allocation Act ("EPAA"), 15

U.S.C. § 751 *et seq.* (1982) (expired in 1981), to alleviate the economic effects of an unexpected

spike in the market price of crude oil.  Pursuant to the enforcement provisions of the EPAA[1] and

---

[1] The EPAA incorporated by reference Sections 207, 208, 209 and 212 of the administrative and enforcement provisions of the Economic Stabilization Act of 1970.  15 U.S.C. § 754(a)(1) (1982); *see also* Economic Stabilization Act of 1970, 12 U.S.C. § 1904 (1976).

a court-approved settlement order, DOE was authorized to collect overcharge funds from sellers who violated the price caps on crude oil put in place from 1973 to 1981 by the EPAA. *See Energy Management* (CCH) ¶ 90,508A; 10 C.F.R. § 205. The settlement agreement, which was finalized in 1986, established a court-approved framework in which DOE adopted a restitutionary policy with respect to non-parties, allowing them to submit claims in refund proceedings against the crude oil overcharge funds held in escrow. *See In re Dep't of Energy Stripper Well Exemption Litig.*, 653 F. Supp. 108 (D. Kan 1986). Prior to the 1986 settlement, there was no mechanism by which corporations who had purchased petroleum at inflated prices could file claims against the overcharge funds held by DOE.

In this action, plaintiff seeks to exercise the rights it claims that a predecessor-in-interest, NSC, had to a refund against the restitutionary overcharge fund. According to plaintiff, when it purchased Weirton Steel in February 2004, it received the right to seek a refund because Weirton Steel had received such a right from NSC. In particular, NSC had purchased petroleum products for its Weirton facility during the regulated period, it then transferred any right to a refund arising from its Weirton facility to Weirton Steel under an April 1983 Agreement (A.R. at 311-82), and therefore, it is plaintiff's position that it gained the right to seek a refund when it purchased Weirton Steel in 2004.

However, plaintiff's claim that NSC transferred its interest in the refund to Weirton Steel was apparently not the understanding of the parties to the 1983 Agreement. In 1989, NSC filed a claim against the DOE overcharge funds in escrow, asserting the right to a refund for the refined petroleum purchases made for its Weirton facility during the regulated period; this is the very right that plaintiff now asserts. (A.R. at 392.) By contrast, in the twenty or so years since acquiring the Weirton facility and before selling it to plaintiff, Weirton Steel never claimed any

interest in the alleged refund and never challenged NSC's claim that it had retained the interest. In March 1991, OHA denied NSC's claim for a refund for its Weirton facility petroleum purchases on the grounds that by virtue of a waiver and release by an NSC affiliate, Permian Corporation, NSC had forfeited this right. (A.R. at 271-74, 392.)

On May 2, 2005, plaintiff filed a motion for reconsideration of OHA's 1991 decision, arguing that NSC had transferred any interest in a potential refund to Weirton Steel, and that neither Weirton Steel nor any of its affiliates had ever waived any right to the refund. (A.R. at 392.) On June 1, 2005, OHA rejected plaintiff's motion for reconsideration, thereby denying plaintiff's claim for a refund. OHA's decision relied on two grounds for denying plaintiff's motion. (A.R. at 393-94.) The first was based on the untimeliness of plaintiff's motion and has not been pursued by defendant in its motion for summary judgment. (Defs.' Mem. at 3.) The second rejected the claim on the merits, finding that the Agreement between Weirton and NSC did not transfer the right to any refund to plaintiff's predecessor-in-interest.

The gravamen of plaintiff's case is that the 1983 Agreement between Weirton Steel and NSC transferred any interest in a refund for Weirton facility purchases to Weirton Steel, even though neither party to the Agreement was aware of this transfer. Plaintiff, in fact, admits that it was not aware that it had acquired this interest until recently, when it was presumably brought to its attention by counsel. (Pl. Stmt. at 17-19.)

In response, defendants counter that the terms of the Agreement clearly provided that NSC retained all refund rights arising from the Weirton facility purchases, and therefore, no interest could have been transferred to plaintiff.

## ANALYSIS

### I.     Standard of Review

The parties disagree as to the applicable standard of review.  Defendants contend that the

court must apply the deferential standard of review established by the Temporary Emergency

Court of Appeals ("TECA").[2]  (Defs.' Mem. at 12.)  This standard was later adopted by the

United States Court of Appeals for the Federal Circuit,[3] and it instructs the court to only set aside

an EPAA agency action if it is "in excess of the agency's authority, or is based upon findings

which are not supported by substantial evidence."  *Phoenix Petroleum Co.*, 95 F.3d at 1567.

Plaintiff rejects this standard, advocating a *de novo* review on the grounds that OHA's decision

did not involve interpretation of its own rules and regulations. (Pl.'s Mem. at 21.)  Citing

*Consolidated Edison Co. v. Richardson*, 232 F.3d 1380 (Fed. Cir. 2000), plaintiff urges that

since the OHA decision involves an interpretation of the Agreement between NSC and Weirton

Steel, which is a contract rather than an agency regulation, it should not be accorded deference.

The Court, however, need not resolve this issue, since under either standard of review it

would affirm the agency's decision.

### II.    Interpretation of the Agreement

The governing principles regarding the interpretation of a contract are well-established.

"The District of Columbia recognizes both the parol evidence rule and its relative, the 'plain

---

[2] TECA was designated the appellate court with exclusive jurisdiction to adjudicate claims arising from the EPAA. *See* 15 U.S.C. § 754(a)(1) (1982) (incorporating provisions from the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 (1976)).

[3] TECA was abolished in 1993.  Federal Courts Administration Act of 1992, Pub. L. No. 102-572, 106 Stat. 4506 (1992).  Both its jurisdiction and precedent were adopted by the United States Court of Appeals for the Federal Circuit.  *Tex. Am. Oil Corp. v. Dep't of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995); *Phoenix Petroleum Co. v. Fed. Energy Regulatory Comm'n*, 95 F.3d 1555, 1565 (Fed. Cir. 1996).

meaning' canon of contract interpretation." *Lee v. Flintkote*, 593 F. 2d 1275, 1280 (D.C. Cir.

1979). The plain meaning of a contract is determined by "the language used by the parties to

express their agreement." *WMATA v. Mergentime Corp.,* 626 F.2d 959, 961 (D.C. Cir. 1980). If

that language is unambiguous, "the court may interpret it as a matter of law." *America First Inv.*

*Corp. v. Goland*, 925 F.2d 1518, 1520 (D.C. Cir. 1991). A contract is ambiguous when it is

"reasonably susceptible of different constructions or interpretations." *1901 Wyoming Ave. Coop.*

*Assoc. v. Lee*, 345 A.2d 456, 461 n.7 (D.C. 1975). Only if the contract is ambiguous may

extrinisic evidence be introduced to clarify the intentions of the parties. *Consol. Gas*

*Transmission Corp. v. FERC*, 771 F.2d 1536, 1546 (D.C. Cir. 1985).

Both parties agree that two provisions of the Agreement are relevant to the issue of the

transfer of any right to a refund -- Sections 3.1 and 7.2. (Pl.'s Mem. at 14; Defs.' Mem. at 14-

15.) Section 3.1 addresses the transfer of refunds or rebates and Section 7.2 assigns

responsibility for proceedings based on facts prior to the purchase. (A.R. at 319, 328.) Section

3.1 states in relevant part:

> the Seller will retain for its own account any payments received from Columbia
> gas, Conrail or any other Person representing overcharges or refunds prior to the
> Purchase Date . . . The Buyer will retain for its own account any payments
> received from Columbia Gas, Conrail or any other Person representing
> overcharges or refunds subsequent to the Purchase Date.

(A.R. at 320.) Section 7.2 provides that "except as provided otherwise in this Article, the Seller

will take full responsibility for . . . and retain any recovery from, all Proceedings which are not

Pending Proceedings, to the extent such Proceedings involve claims based on facts occurring or

existing prior to the Purchase Date." (A.R. at 328.) "Proceedings" are defined as "any claim of

the Division against any Person . . . or any controversy or request for relief which may be sought

in any . . . administrative agency." (A.R. at 374.) "Pending Proceedings" are defined as those

listed in an Appendix to the Agreement. (A.R. at 382-92.) Claims for refunds from petroleum

purchases for the Weirton facility are conspicuously absent from that list.

Plaintiff argues that Section 3.1 should not control, because the list of entities it includes

refers explicitly to certain vendors. (Pl.'s Mem. at 25.) Plaintiff therefore concludes that the

Seller only retains the right to recover from vendors and not from government agencies. This

claim flies in the face of Section 3.1, which is *not* limited to vendors, but also includes

"Persons," who are defined to include "an individual, a corporation . . . *or a government or any*

*agency or political subdivision thereof.*" (A.R. at 373 (emphasis added).) Thus, the "plain

meaning" of the Agreement clearly provides that DOE should be included as a "Person" from

whom any overcharge refund would be retained by the Seller.

But even if the Court could find this provision to be ambiguous, which it is not, it would

look to the intent of the parties as evidenced by their subsequent conduct, which makes clear that

the right to the refund was not intended to be transferred. As the undisputed evidence

demonstrates, Weirton Steel never attempted to claim the refund for itself, nor did it challenge

NSC's attempt to do so in June 1989. Thus, any conceivable ambiguity would be resolved by

reference to the subsequent conduct of the parties, who clearly did not think that the right to the

refund had been transferred. *See Waverly Taylor, Inc. v. Polinger*, 583 A.2d 179, 182 (D.C.

1990) ("[W]here a contract is ambiguous, the trial court may, explicitly or implicitly, consider

extrinsic evidence such as ' . . . the course of conduct of the parties under the contract.'")

(citation omitted).

Plaintiff also argues that since the procedure for claiming a petroleum overcharge refund

set forth *In re Dep't of Energy Stripper Well Exemption Litigation*, 653 F. Supp. at 108, was not

put in place until after the 1983 Agreement, the right to the refund is a "fact" arising after the

purchase.  (Pl.'s Stmt. at 35.)   Plaintiff therefore urges the Court to conclude that the allocation

of such a refund was not within the contemplation of the Agreement, and that the existence and

acknowledgment of such a legal right should be viewed as a necessary condition for its

allocation.

      Plaintiff, however, fails to provide any support for this strained interpretation.  The

Agreement between NSC and Weirton Steel allocated the rights and liabilities arising from the

facility's operation by using the date of the Agreement as the operative date.  Section 7.2 of the

Agreement provides that the "Seller will take full responsibility for, conduct at its own expense,

discharge any liability relating to, and retain any recovery from, all Proceedings . . . to the extent

such Proceedings involve *claims based on facts* occurring or existing prior to the Purchase

Date." (A.R. at 14 (emphasis added).)  Plaintiff attempts to conflate the terms "claims" and

"facts" giving rise to claims in violation of the Agreement's plain meaning.  Contrary to

plaintiff's argument, the Agreement recognizes a difference between claims and facts, and if

facts existed prior to the time of the sale, then the seller retains any rights arising from those

facts.  NSC made the petroleum purchases for the Weirton facility during the period of price

controls, these purchases were made prior to the Agreement, and thus, according to the

Agreement, NSC retained any potential interest stemming from these purchases.  This was

obviously the understanding of the parties as well.

      Since the 1983 Agreement did not transfer any right to a restitutionary award to Weirton

Steel, it follows that plaintiff did not obtain this right when it bought Weirton Steel in 2004.

OHA's decision was therefore correct in holding that plaintiff has failed to rebut OHA's

presumption in favor of compensating the owner who allegedly suffered the harm from the

overcharges during the period of price controls.  (*See* A.R. at 393.)

## CONCLUSION

Based on the foregoing analysis, the Court affirms OHA's interpretation of the

Agreement between Weirton Steel and NSC.  The Court therefore **GRANTS** defendants' motion

for summary judgment [#13], **DENIES** plaintiff's motion for summary judgment [#14], and

**DISMISSES** the above-captioned complaint.


_____s/_____
ELLEN SEGAL HUVELLE
United States District Judge


Date: June 2, 2006